In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2658

JOSE GONZALEZ, MARIBEL GONZALEZ,
ANTONIO FRANCO, MARIA GONZALEZ,
LUIS FRANCO, and JULIO GONZALEZ,

*Plaintiffs-Appellants*,

*v.*

CITY OF ELGIN, MIGUEL PANTOJA,
SHAUN SCHROEDER, TODD PAVORIS,
HEATHER ROBINSON, DOUG NEFF,
DANIEL MCGINLEY, and JAMES KELLY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 5321—**Samuel Der-Yeghiayan,** *Judge.*

ARGUED JANUARY 21, 2009—DECIDED AUGUST 20, 2009

Before POSNER, FLAUM, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Jose Gonzalez, Maribel Gonzalez,
Antonio Franco, Maria Gonzalez, Luis Franco, and Julio
Gonzalez filed this action under 42 U.S.C. § 1983 against

the City of Elgin and numerous Elgin police officers. The plaintiffs allege that the defendants violated their Fourth Amendment rights by unlawfully arresting and detaining them, using excessive force against them to effectuate the arrest, and failing to intervene to prevent the excessive use of force. The complaint also alleges three claims based on Illinois law: one for malicious prosecution, one against the City of Elgin based on state-law concepts of *respondeat superior,* and one for indemnification. The district court granted the defendants' motion for summary judgment, and the plaintiffs appeal to this court.

**I**

A

The facts of this case are highly contested; a person comparing the plaintiffs' version with that of the defendants would be forgiven for thinking that each was recalling an entirely different event. The standard of review governing summary judgment, however, resolves at least one question: we must accept all facts and reasonable inferences in the light most favorable to the non-moving party—here, the plaintiffs. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *cf. Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149-51 (2000) (addressing standard for motions under FED. R. CIV. P. 50 and noting that the substantive approach mirrors that for Rule 56). We do not judge the credibility of the witnesses, evaluate the weight of the evidence, or determine

the truth of the matter. The only question is whether there is a genuine issue of fact. *Anderson,* 477 U.S. at 249-50. We present the facts with this standard in mind, noting where relevant the divergence between the plaintiffs' and the defendants' versions of events.

In the wee hours of October 1-2, 2005, plaintiffs were gathered at the home of Antonio and Luis's parents in Elgin, Illinois. (We refer to the plaintiffs by their first names in the remainder of this opinion, since only two surnames are shared by the six plaintiffs.) The plaintiffs (with the exception of Luis) were former high school classmates now in their late twenties and early thirties. Earlier that night, they had attended a wedding and had decided to visit with each other after the wedding ended. While Jose, Julio, and Antonio drank alcoholic beverages at the wedding (the plaintiffs' evidence shows that Jose drank several light beers, Julio drank a couple of beers, and Antonio drank about three beers), they did not drink at all after the wedding ended. Neither Maribel, Maria, nor Luis drank anything alcoholic either at the wedding or at the subsequent gathering.

At around 4:30 a.m., as the plaintiffs were getting ready to leave the gathering, Rodolfo Aranda came running into the house. Earlier, Aranda had been at Luis and Antonio's parents' house with the plaintiffs, but then he, his wife, and his brother left to eat at La Rosa, a nearby restaurant. Aranda told the group that his wife and brother were being beaten up outside the restaurant and that he needed help. The group followed Aranda to the restaurant on foot, but by the time they arrived, the

attack on Aranda's wife and brother was over and the attackers had left. The defendants apparently were alerted to the scene by Officers Pantoja and Schroeder, who were busy with a traffic stop near the restaurant and observed the plaintiffs moving toward the restaurant. What occurred then differs for each plaintiff, and from this point it is sensible to proceed one person at a time. Furthermore, because police cameras captured at least some of the events of the evening in question, we also take advantage of our direct observation of the scene.

1. *Jose Gonzalez*

At his deposition, Jose testified that once the group reached La Rosa, they found Aranda's wife and brother on the ground in the restaurant's parking lot. Jose went over to the brother to see whether he was all right. After that, a group of about five people, including Antonio, Jose, Luis, and the restaurant owner, stood talking outside the restaurant. Officer Pantoja approached the group and spoke with Antonio and the owner of the restaurant, and then snapped, "Oh you know, just everybody get the fuck out of here. Everybody gotta go." Jose asked Officer Pantoja why, because he thought that the plaintiffs had done nothing wrong. Officer Pantoja responded, "I did say for you guys to leave, to get the fuck out of here." At that point, Jose noticed more police cars arriving at the restaurant, and so he grabbed Luis's arm and said, "Let's walk away."

Jose and Luis then walked out of the restaurant parking lot onto the sidewalk and around the newly arrived police

vehicles; they were heading east on Villa Street toward Luis's parents' house. At that point, Officer Pantoja screamed out for another officer to arrest Jose and Luis. Jose turned and responded by asking, "Arrest who?" An officer then grabbed him around the neck from behind before other officers ran at him. The officers punched and kicked him for a few minutes before pushing him to the ground and kicking him some more. The officers then pepper-sprayed Jose, and they finally handcuffed him. The officers left Jose in this state on the ground on his knees for approximately five minutes, during which time Jose's wife, Maribel, spoke to him, asking him whether he was okay and telling him to stop cursing because it would "make it worse." Jose's testimony was corroborated by a number of the defendants' depositions. Jose was charged with mob action and resisting a peace officer; the prosecutor later dismissed the mob action charge and reduced the resisting charge to misdemeanor disorderly conduct.

The defendants offer a markedly different account of this scene—one that a jury might believe, but not one that we can accept for purposes of summary judgment review. We outline it here (just as we do for the other plaintiffs below) simply to show the wide gap between the two sides' stories. The defendants assert that once Officer Pantoja asked the plaintiffs to leave the restaurant parking area, Jose began yelling, arguing, and swearing at Officer Pantoja. Officer Pantoja recalled that Jose was agitated, smelled of alcohol, had clenched fists, and poked him in the chest. Officer Pantoja said that he (Pantoja) then displayed his pepper-spray but did not use

it. Instead, he told Jose that he was going to be put under arrest for refusing to leave the restaurant. The defendants then asserted that Officer Pantoja informed the newly arrived Officer Pavoris that Jose was to be arrested, and Officer Pantoja, along with Officer Schroeder, began to place a struggling Jose under arrest. By this account, Officer Neff soon arrived on the scene and ran to assist Officers Pantoja and Schroeder in Jose's arrest. The defendants stated that Jose then accidentally fell over a low rise fence, and only when he continued to struggle did officers pepper-spray him in order to place him in handcuffs.

Both parties believe that the video from squad car 857 ("Video 857") supports their version of events. That video starts at 4:55:42 a.m. on October 2, 2005. (All times recorded on the cameras were in the morning; we therefore omit the designation "a.m." from this point onward.) Initially, it shows the squad car parked at the side of a road. The car begins to move at 4:56:30, and reaches speeds of up to 79 miles per hour before coming to a stop at 4:58:00 by the side of a road. Once the squad car comes to a stop, it shows a group of people calmly walking down the street, showing no apparent agitation.

While the quality of the video is not particularly clear, it appears to show, at approximately 4:58:15, a man in a white shirt, presumably Jose (though this is just an inference we are drawing) being tackled by a police officer. The video then shows that a number of police officers converge on Jose, punching and kicking him while he remains bent over in a defensive position. Jose then falls

to the ground and when he gets up, hands held in what seems to be a "surrender position," an officer tackles him to the ground and grabs him by the neck, pushing on him. The officer remains straddled over Jose, holding onto him until 4:59:54, when the officer seems to hand-cuff him and then leave him alone on the ground. Jose remains alone on the ground while police officers calmly walk around the restaurant parking lot until approximately 5:02:15, when a number of officers gather around him. Jose is picked up by an officer at 5:02:37 and is walked to the police van positioned directly in front of squad car 857.

### 2. *Maribel Gonzalez*

Maribel testified that when the plaintiffs reached the restaurant, she observed a group of customers outside the doors, along with Aranda's wife and the owner of the restaurant. Maribel estimated that there were no more than ten people in the group. Maribel walked over to the group to console Aranda's wife, and it was at that point that Officer Pantoja asked the group to disperse and leave the premises. Maribel then left the scene with three others and started walking away from the restaurant down Villa Street. As they left, Officer Pantoja and another officer followed them, repeatedly telling them, "Get the f'ing out of here," and using other foul language. At that point a number of squad cars pulled up near where they were walking, and all of a sudden an officer grabbed Jose around the neck from behind. A number of officers converged on him, punching and kicking him,

while Maribel, along with others, asked the officers to stop and questioned why they were hitting Jose.

During Jose's beating, Maribel told the officers, "I think you guys have the wrong people," thinking that the officers thought her group was responsible for beating Aranda's wife and brother. When the officers picked Jose up off the ground, Maribel followed them saying, "You guys, we didn't do anything," and asking, "Why are you guys arresting us?" When the officer took Jose to the back of the police van, she asked the officer where he was taking Jose. In response, another officer, later identified as Officer McGinley, turned and punched her in the stomach with his flashlight. According to Maribel, Officer McGinley never said a word to her before hitting her with his flashlight. It was only after he hit her that he spoke to her, calling her a "fucking bitch" as he pulled her away from the police van by her hair and pushed her down, face first, onto the hood of a police car. Maribel was then arrested and taken to the police station with Jose where Officer McGinley charged her with mob action and obstructing a police officer. Officer McGinley later admitted that the complaints were never sworn in accordance with police department policy, and that he never actually saw Maribel fighting.

The defendants offered little evidence about Maribel's role in the incident. In essence, they testified that she was arguing with Officer Schroeder and trying to obstruct Officer McGinley's motions. Again, both parties claim that Video 857 supports their version of events. With respect to the arrest of Maribel, Video

857 shows officers leading Jose to the back of the police van, followed closely by Maribel, who is visibly distressed. Maribel appears to be questioning the officers repeatedly, but it is not possible to see whether the officers replied, and the video has no sound track. At no point does Maribel touch either of those officers. As Maribel is standing next to the two officers who are putting Jose in the van, Officer McGinley walks over to Maribel and positions his body between her and the other officers. Officer McGinley appears first to press the end of his flashlight lightly against Maribel to keep her at arm's length. Then, moments later, he jabs her violently in the stomach with the flashlight and shoves her with great force out of the street and up onto the curb; this occurs at 5:03:57. Maribel is then led out of view of Video 857.

Notably, Officer McGinley was fired as a result of this incident. In his police incident report, Officer McGinley failed to disclose any use of force against Maribel. Sergeant James Barnes of the Elgin Police Department Internal Affairs testified that McGinley lied about not touching Maribel. At his termination hearing, McGinley persisted with his story that he did not touch Maribel, but witnesses agreed that Video 857 clearly showed that he did push Maribel. McGinley's discharge was upheld by an arbitrator.

3. *Luis Franco, Jr.*

Luis testified that, when the group reached the restaurant, he walked over to some customers, including Aran-

da's wife, who were standing outside. As Luis was talking to Aranda's wife, Officer Pantoja was aggressively telling everyone to leave. Luis and Jose left the restaurant parking lot together; while they were walking, Luis heard an officer call out for Jose to be arrested. The officers then converged on Jose and began beating him; Luis was yelling at the officers to stop. At that point Luis's wife, who is not a party to this suit, told him to leave immediately; Luis and his wife then crossed the street and began walking down the footpath away from the restaurant. They stopped only when they heard an officer yell out for Luis to be arrested. Luis told his wife to keep walking. The next thing he knew, he was knocked to the ground by an officer, later identified as Officer Neff. Officer Neff asked a nearby civilian to guard Luis; Luis was not handcuffed immediately.

After a while, two or three officers came over to Luis and handcuffed him. One of the officers then picked up a police hat that was lying on the ground near Luis, called him a "fucking thief," and threw the hat in his face. Luis recalled that he was then picked up from behind and slammed into the hood of a car before being put into the back of a police car. Luis was later charged with one count of mob action on the basis of Officer Pantoja's signed complaint. Officer Pantoja, however, later admitted that he did not see Luis engage in any illegal conduct, and the charge was dismissed.

The defendants' account of Luis's arrest is thin on detail. They said that Officer Neff saw Luis leaving the restaurant. Neff ran after him because Neff earlier had

observed Luis in a crowd that was pushing and shoving officers to prevent the arrest of Jose. Officer Neff "caught up to Luis," observed a police hat in his hand, asked him why he had the cap, and told him to get on the ground. Officer Neff then left Luis and returned to the restaurant. Other officers later handcuffed Luis and placed him in a squad car.

Again, squad car videos shed some light on what actually occurred. The video from squad car 862 ("Video 862") shows a man and a woman (apparently Luis and his wife) walking across Ramona Avenue away from La Rosa. Luis and his wife are both wearing white tops and are walking down a footpath on Villa Street away from the scene of Jose's arrest; they first appear on the video at 4:59:30. Approximately 20 seconds later, an officer (presumably Officer Neff), is visible in Videos 862 and 857 jogging across Ramona Avenue toward the retreating couple. At 4:59:53, Video 862 shows Luis turn to face Officer Neff while his wife continues to walk away. Moments later Officer Neff reaches Luis. At 5:00:01, both videos show Officer Neff standing in front of Luis pointing toward the ground. Officer Neff shoves Luis forcefully to the ground, where he remains for some time.

An arriving police truck pulls up, blocking much of the view from squad cars 862 and 857 at 5:00:41. Less than a minute later, however, both videos show Officer Neff jogging back across the street to the restaurant parking lot. Video 857 shows him standing there talking to people for about one minute. In the meantime, Video 862 depicts yet another police car pulling up on Villa Street near

the spot where Luis had been shoved to the ground. At 5:01:30 the police car shines its search light in the direction of Luis and an officer exits the vehicle. Shortly thereafter, Officer Neff is seen jogging across Ramona Avenue for a second time. At 5:02:41, Luis is led to the adjacent police car. Following a 30-second period where Luis and the officers are next to the car but it is difficult to see what is going on, Luis is put into the back seat of the vehicle. Seconds later, three officers can be seen crossing back over the street toward La Rosa.

4. *Antonio Franco*

Antonio testified that when he arrived at La Rosa he walked up to the small group of people who were standing with Aranda's wife and began to speak with the owner. When Antonio saw that Jose was being punched, hit, and kicked by a number of police officers, he quickly walked over and told the officers that Jose and the others had done nothing wrong. After he made that comment, one of the officers turned and punched him in the face. Antonio is unsure whether the officer used a fist or an object. The punch knocked him to the ground, at which point the officer fell on top of him and grabbed at his clothes to pull him back up. At the same time another officer was pulling at him from behind and dragging him on the ground. Yet another officer pepper-sprayed Antonio as he was being dragged along the ground. Once he was pulled upright, the officers continued to punch him; he was also pepper-sprayed a second time.

Antonio recalls hearing his father's voice asking the police to stop, as well as the police swearing and cursing at him. Antonio was then handcuffed and pushed to his knees; at that point, as he remembers, he was again beaten in the face and head while handcuffed. A more senior officer soon arrived on the scene and ordered that Antonio be taken to the hospital. Antonio was never told that he was under arrest. He was charged with resisting a police officer, mob action, and battery; the state later dropped all charges.

According to the defendants, Antonio ran to the scene of Jose's "arrest" and "made repeated physical contact" with the police officers while they attempted to arrest Jose. The defendants claim that Officer Pavoris attempted to place Antonio under arrest, that Officer Pavoris advised Antonio that he was under arrest, and that Antonio resisted Officer Pavoris's effort to handcuff him and place him under arrest, backing away, generally being defiant, and asking, "Why?" and "How come?" The defendants claim that Officer Schroeder then gave Antonio several "controlled strikes to achieve compliance in handcuffing" him, after which Antonio "fell down face forward to the ground" and was pepper-sprayed and handcuffed by Officer Pavoris. When Sergeant Kelly arrived, the defendants say, he ordered that Antonio be taken to the hospital.

Most of these events were captured on Video 857. It begins when a man, later identified as Antonio, jogs toward the melee surrounding Jose and into the view of camera 857, at 4:58:28. Video 857 then shows Antonio

getting into the middle of the fight and a police officer punching his head and falling to the ground on top of him, seemingly continuing to punch him. Officers then continue to kick and punch Antonio until he is face down on the ground. Antonio is pulled out of the view of camera 857 at 4:58:42.

5. *Julio Gonzalez*

Julio testified that when he arrived at La Rosa he walked straight over to talk to the restaurant owner, who was standing with customers near the entrance. After Julio had been talking with the owner for a short time, Officer Pantoja walked over and told the group that they needed to move. Julio testified that he understood Officer Pantoja to be asking them to move aside, rather than off the premises, and so he and the owner moved a little away from where they were originally standing and continued their conversation. A number of officers then arrived *en masse*, and one officer ran over to Julio and pepper-sprayed him, without warning, in the face. Julio claims that he heard the restaurant owner tell the police, "You guys got the wrong guys," and ask, "[W]hy are you spraying him?" The owner then helped Julio inside the restaurant to wash the spray off.

When Julio went back outside, he saw officers assaulting Antonio and walked over, with his hands in his pockets, and told the police, "[Y]ou guys got the wrong guys." One of the officers pushed him away with an object, either a baton or flashlight, and so he turned and walked away, over to where the restaurant owner

was standing. At that point, without warning, an officer grabbed Julio's hands and held them behind his back and pepper-sprayed him in the face. Julio was then handcuffed and his feet were swept out from under him so that he fell to the ground. Julio then asked an officer why this was happening, at which point he was told to "shut up" and pepper-sprayed for a third time. Julio ended up in the back of the police van. Julio was never told that he was under arrest, and he never tried to resist the officers. Julio was charged with mob action and resisting a peace officer; like the others, these charges were later dismissed.

The defendants again tell a different story. They say that Officer Pavoris administered pepper spray to Julio because Julio ran at Officer Pavoris while he attempted to place Antonio under arrest and because Julio questioned the officers arresting Antonio. Julio was pepper-sprayed a second time, according to the defendants, because he attempted to obstruct Officer Robinson's arrest of Maria by "repeatedly . . . approach[ing] the area where Officer Robinson was attempting to handcuff Maria, despite instructions from Officer Neff to keep back." The defendants assert that at no point was Julio "struck" by any police officer.

Neither party points to any video evidence of Julio's arrest. From the parties' versions of events, however, one might infer that Julio appears briefly on Video 857; at 4:58:36 we see a man walk towards the officers who are beating Antonio. This man is forcefully pushed back by an officer, and then disappears from view.

6. *Maria Gonzalez*

Maria is the final plaintiff. She testified that once she arrived at La Rosa she, along with Antonio and Julio, walked up to the restaurant owner, who was standing near the door of the restaurant. She could hear other customers telling the police to go after the people who beat up Aranda's wife, and she heard the police respond by saying, "[G]et the fuck out of here." Maria then heard some noise and turned to see Jose being beaten up by police officers. She walked over to the officers and, without warning, she was pepper-sprayed. Maria then slumped against the fence for a short time before she noticed that Antonio, her husband, was being beaten by the police. Maria walked up to the police and pleaded with them to stop, saying, "We didn't do anything. Leave him alone." The police responded by pepper-spraying Maria again and then handcuffing her. Immediately after she was cuffed, a male officer threw Maria face-first into a nearby flowerpot. While in the flowerpot, she was hit in the head and arms until a female officer pulled her out by her hair; once out, she was again hit in the head. Maria was then taken to the police station where she repeatedly was called a "stupid bitch," a "Mexican bitch," a "Mexican whore," and "all the names you can imagine." Maria was charged with mob action, battery, and resisting an officer; all charges were later dismissed.

As with each of the five other plaintiffs, the defendants' version of events differs significantly from Maria's. The defendants contend that Maria was initially pepper-sprayed because she kicked Officer Pavoris from behind

as he attempted to handcuff Antonio. They say that as the officers were attempting to restrain her, Officer Robinson and Maria fell into a flower box. Because Maria was "tensing up and flailing and kicking her feet," Officer Pavoris, the defendants say, was "required to administer pepper spray to her eyes." Eventually, Maria was placed in the back of a police car and transported to the police station.

No video depicts the events surrounding Maria's actual arrest, but a woman who may be Maria appears briefly, starting at 4:58:31, in Video 857. The woman enters the right-hand side of the video just after Antonio runs toward the group of police officers beating Jose. As she works her way into the brawl, it appears that she may have lightly pushed a couple of the officers. At 4:58:38, she is pepper-sprayed in the face and is seen leaning against a fence, holding her head in pain for over a minute. The woman exits Video 857 at 4:59:49 and is not seen again.

We note that in addition to Videos 857 and 862, the record also contains videos from squad cars 818 and 890. These videos do not depict any of the events outside La Rosa. Tellingly, however, throughout the relevant time they show police officers leisurely walking around the vicinity of the restaurant, exhibiting a palpable lack of urgency.

B

In the district court, the defendants moved for summary judgment on all counts, and, on June 24, 2008,

the district court granted their motion. The court ruled that the plaintiffs had failed to present sufficient evidence that the events happened as they described them. With respect to the Fourth Amendment claim based on unlawful arrest, the district court wrote that the defendants were "faced with [a] chaotic scene in front of the Restaurant involving two groups, a fight, and then a refusal by the parties to leave," and that all plaintiffs "approached" the officers. The district court criticized the plaintiffs for failing "to cite to sufficient evidence that would indicate that the crowd was not agitated . . . . [and] that none of the people in the crowd smelled of alcohol." The court also said that the plaintiffs had not "provided any lawful justification . . . to come in such close proximity to officers attempting to arrest another individual." Therefore, the district court concluded, the defendants had probable cause to arrest the plaintiffs.

Turning to the plaintiffs' claim that the police violated the Fourth Amendment by using excessive force in connection with the arrest, the district court ruled that there was insufficient evidence showing that the defendants did so. Not only, the court said, was there probable cause to arrest the plaintiffs, but the "undisputed facts clearly show that [the defendants] used appropriate amounts of force in light of the totality of the circumstances including the split second decisions that [the defendants] had to make in dealing with the agitated crowd that they were faced with at the scene." The court added that because there was insufficient evidence that the defendants used excessive force, there was also no basis for the plaintiffs' Fourth Amendment failure-to-intervene claim.

The district court similarly dismissed the plaintiffs' state-law malicious prosecution claim and their claim against the City, in which they sought to impute to the City the tort liability of the police officers under a state-law theory of *respondeat superior.* (The Supreme Court has ruled out this kind of vicarious liability under 42 U.S.C. § 1983. See *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1948 (2009) (citing *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691 (1978)).) The district court held that "there is also insufficient evidence to show that [the defendants] had malice against [the plaintiffs] as to any of the charges brought against [the plaintiffs] . . . ." The court noted that in any event the defendants were "entitled to qualified immunity for their conduct" because they "could have reasonably believed that their conduct was within the bounds of the law." The district court also dismissed the plaintiffs' equal protection claim and denied their motion to strike.

The plaintiffs do not pursue the equal protection theory on appeal, nor have they said anything about a state-law indemnification claim that the court dismissed under Rule 12(b)(6). In addition, the plaintiffs have withdrawn their appeal of the district court's grant of summary judgment on Jose's false arrest claim, and so that issue is no longer before us.

## II

### A.  Unlawful Arrest Claim

In order to prevail on a claim of an arrest in violation of the Fourth Amendment, the plaintiffs must show that

they were arrested without probable cause; probable cause is an absolute defense to such a claim. *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007). A police officer has probable cause to arrest a person if, at the time of the arrest, the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). In ascertaining whether an officer had probable cause, the court is to view the circumstances from the perspective of a reasonable person in the position of the officer. *Chelios*, 520 F.3d at 686. The jury must determine the existence of probable cause "'if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'" *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1013-14 (7th Cir. 2006) (quoting *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993)). Only if the underlying facts claimed to support probable cause are not in dispute may the court decide whether probable cause exists. *Maxwell*, 998 F.3d at 434.

### 1. *The Plaintiffs' Arrests for Mob Action*

All plaintiffs were arrested for mob action. The critical question is whether the defendant officers had a reasonable belief that the plaintiffs, acting together, used either force or violence, thereby disturbing the public peace, or, alternatively, that the defendant officers could reasonably have believed that the plaintiffs were assem-

bled to do an unlawful act. See 720 ILCS 5/25-1(a)(1) (defining mob action as "[t]he use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law"); 720 ILCS 5/25-1(a)(2) (defining mob action as "[t]he assembly of 2 or more persons to do an unlawful act"). If the plaintiffs were not using force or violence and were not assembling to do an unlawful act, the officers did not have probable cause to arrest them for mob action. (Before the district court, the plaintiffs also argued that 720 ILCS 5/25-1(a)(2) is unconstitutional, relying on *Landry v. Daley*, 280 F. Supp. 938, 955 (N.D. Ill. 1968), *rev'd on other grounds sub nom. Boyle v. Landry*, 401 U.S. 77 (1971). They have abandoned this argument on appeal, and so we do not consider it further.)

   Both the district court's decision and the defendants' argument supporting probable cause are premised on the factual assumption that, when police first arrived at La Rosa, the scene was chaotic and mob-like. But this proposition was disputed through first-hand accounts of those who were present, as we have recounted in detail above. In their depositions, the plaintiffs reported that when they arrived at La Rosa, the alleged assailants of Aranda's wife and brother had already left. By the time the police arrived, the plaintiffs were calmly chatting with the restaurant owner and tending to the two injured parties. The videos from the police vehicles support this account. The only point at which "chaos" is apparent on the videos is when the officers surround the plaintiffs and appear to beat them. Indeed, one is struck by the officers' apparent lack of urgency on at

least one of the videos, which shows them resting against cars, wandering around the scene, and pausing to talk and laugh with one another.

In the face of the plaintiffs' evidence (taken in the light most favorable to them), the district court's conclusion that "it is undisputed that Officers Pantoja and Schroder [*sic*] arrived at a chaotic scene involving a fight between two groups of people with others running to intervene in the fray" is unsupportable. The evidence on which the district court relied—the officers' testimony that the crowd appeared "intoxicated and agitated," that the crowd did not immediately disperse when instructed to do so, and that at least some of the plaintiffs were visibly intoxicated—was all contested. Because there are disputes of material fact with respect to the elements of mob action, the district court erred in ruling that the defendants had probable cause as a matter of law to arrest the plaintiffs for that offense.

2. *The Plaintiffs' Arrests for Resisting or Obstructing a Peace Officer*

Antonio, Julio, Maria, and Maribel were arrested for resisting or obstructing a peace officer. 720 ILCS 5/31-1(a) ("A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his official capacity commits a Class A misdemeanor."). In order to support the district court's ruling on this point, there must be no dispute that the facts showed that these plaintiffs knowingly resisted or obstructed the officers' work.

Once again, in light of our detailed recitation of the facts above, we can be relatively brief. The district court's finding of probable cause for the resisting and obstructing arrests of Antonio, Julio, Maria, and Maribel was flawed. The court thought that probable cause existed because each of these plaintiffs approached the defendant officers while those officers were attempting to arrest another of the plaintiffs. But, without more evidence, there is nothing wrong in itself with approaching a police officer. The plaintiffs do not dispute that they approached the officers, but they say that they were just asking the officers what was going on. Later, they questioned why they were being arrested. As we noted in *Payne v. Pauley,* "It is well settled under Illinois law . . . that the resistance must be physical; mere argument will not suffice." 337 F.3d 767, 776 (7th Cir. 2003). "In fact," we continued, "the First Amendment protects even profanity-laden speech directed at police officers." *Id.*; see also *People v. Long*, 738 N.E.2d 216, 222 (Ill. App. Ct. 1st Dist. 2000) ("Merely arguing with a police officer—even using abusive language—does not constitute resisting a peace officer."); *People v. Flannigan*, 267 N.E.2d 739, 741-42 (Ill. App. Ct. 5th Dist. 1971) (disrespect for the law, antagonism, or belligerence is insufficient to constitute resisting or obstructing a peace officer). Construing the facts and inferences in the light most favorable to the plaintiffs, the facts here are also disputed. The plaintiffs' evidence, if believed by a trier of fact, shows that the plaintiffs neither tried to run, nor did anything more than insulate themselves from the officers' actions. On this version of events there was no opportunity

for the plaintiffs to resist arrest or to impede any of the defendant officers' duties. It was therefore error to grant summary judgment for the defendant officers on the assumption that the undisputed facts demonstrated probable cause for the arrests of Antonio, Julio, Maria, and Maribel for resisting or obstructing a peace officer.

3. *The Plaintiffs' Arrests for Battery*

Two plaintiffs, Antonio and Maria, were arrested for battery. Under 720 ILCS 5/12-3(a), it is a battery if a person "intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." Antonio testified that he did not touch any of the defendant officers. Instead, he simply spoke to them. Similarly, Maria testified that she did not touch any officers. All she did was ask them to stop beating Antonio, her husband. These accounts are enough to create a genuine issue of material fact; they are flatly inconsistent with the defendant officers' story. The parties sharply dispute not only whether Maria and Antonio intentionally or knowingly touched any of defendant officers, but also whether they touched any of the defendant officers at all.

B. Excessive Force Claim

A claim that a police officer has used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a citizen is addressed to the reasonableness

of the seizure, under the standards established by the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005). An officer's use of force is unreasonable from a constitutional point of view only if, "judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987).

The reasonableness inquiry involves a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). We must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* We also bear in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. A factual inquiry into an excessive force claim "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . ." *Abdullahi*, 423 F.3d at 773 (internal quotation marks omitted).

Once again, the district court did not view the facts that pertain to this issue in the light most favorable to

the plaintiffs. Our account shows that a jury could reasonably find that the force used by the defendant officers in arresting each of the six plaintiffs was unreasonable. The plaintiffs never posed a threat to the officers, they complied with the requests that were directed to them, and some were never even informed that they were under arrest. At most, one or more may have become verbally belligerent or inadvertently made physical contact at some point. None of the plaintiffs resisted arrest. Tellingly, the videos show that even while the plaintiffs were being beaten, they were not fighting back in the way that the defendants describe. A jury could certainly find that the plaintiffs' conduct in no way warranted the response of the officers that the plaintiffs reported and that the video shows.

The district court thought that the undisputed facts depicted a chaotic scene to which the defendant officers were entitled to respond. It also may have placed some weight on the plaintiffs' failure to show that they had suffered any sustained injuries as a result of the arrests. If so, that too would have been a mistake. Whether the scene was chaotic or mob-like is sharply disputed, both through the plaintiffs' testimony and the video footage showing the officers moving slowly—almost lethargically—throughout the relevant period. Furthermore, although evidence of injury can throw some light on the question whether the officers used excessive force, there is no requirement that plaintiffs show any particular degree of injury. *Chelios*, 520 F.3d at 690. In any event, all of the plaintiffs testified that they were injured, with some plaintiffs (Antonio, for example) testifying that they were seriously injured.

Taking the facts in the light most favorable to the plaintiffs, a jury could find that the defendant officers used excessive force in the course of the plaintiffs' arrest. This requires us to address the plaintiffs' related claim that the officers standing by were also culpable for failing to intervene in the beatings. The district court threw these claims out based on its rejection of the predicate claim of excessive force. In our view, the facts taken in favor of the plaintiffs are also capable of supporting a claim for failure to intervene. That theory will therefore be open once again on remand.

## C. Qualified Immunity

Last, we address the officers' assertion that they are entitled to qualified immunity, even if they cannot prevail outright on the merits. Qualified immunity shields public officials from liability when they act in a manner that they reasonably believe to be lawful. *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). The doctrine allows "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted). Accordingly, qualified immunity is an available defense for "officers who make a reasonable error in determining whether there is probable cause to arrest an individual." *Chelios*, 520 F.3d at 691.

The Supreme Court has identified two key inquiries for qualified immunity assertions: (1) whether the facts, taken in the light most favorable to the plaintiffs, show

that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Pearson v. Callahan,* 129 S. Ct. 808, 815-16 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). *Pearson* held that the court may decide these questions in whatever order is best suited to the case at hand. 129 S. Ct. at 818. The first question is one of law. The second requires a broader inquiry. Since the purpose of qualified immunity is to protect public officials from guessing about constitutional developments at their peril, the plaintiffs have the burden of showing that the constitutional right was clearly established. *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008). They can do so by showing that there is "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial. *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996).

We have already observed that the Fourth Amendment is violated by a full-blown arrest that is not supported by probable cause, and that this is what the plaintiffs assert happened to them. We have also established that this is what the facts show, taking them in the light most favorable to the plaintiffs. This right has been clearly established for a long time. We thus conclude that the defendants are not entitled to qualified immunity on this part of the case. See *Chelios*, 520 F.3d at 691 (finding that

defendant officer was on notice that he lacked probable cause when the plaintiff had not made physical contact and had not behaved in an obstructionist manner); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 762 (7th Cir. 2006).

A seizure for purposes of the Fourth Amendment is unreasonable if it is accomplished through the use of excessive force. See, *e.g.*, *Los Angeles County, California v. Rettele,* 550 U.S. 609, 614 (2007) ("Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a pro-longed and unnecessary period of time."); *Graham,* 490 U.S. at 394. The plaintiffs have described such a seizure, and so we move again to the second inquiry under *Pearson* and *Saucier*: was this right clearly established at the time these defendants acted? We ask that question cognizant of the fact that we must assess the officers' action in light of the particular circumstances facing them. See *Anderson*, 483 U.S. at 639-40. But at this stage, we must accept the plaintiffs' account of those circumstances. In the situation the plaintiffs describe, it is clearly established that officers may not, without provocation, start beating, pepper-spraying, kicking, and otherwise mistreating people standing around a restaurant parking lot (even in the middle of the night). See *Chelios*, 520 F.3d at 692; *Clash*, 77 F.3d at 1048. The defendants are thus not entitled to the form of qualified immunity that protects them from suit. (Naturally, if the trier of fact accepts the defendants' account of the evening, they may still prevail on the merits.)

### D.  Illinois State Law Claims

Finally, the plaintiffs argue that the district court errone-ously dismissed their state-law malicious prosecution claims and their state-law action against the City, seeking to hold it vicariously liable under state law for the offi-cers' torts. Under Illinois law, the elements of a malicious prosecution are (1) commencement of criminal proceedings by the defendants; (2) termination of that matter in favor of the plaintiffs; (3) the absence of probable cause for the proceedings; (4) the presence of malice; and (5) resulting damages. *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). The record contains facts that, if accepted by a jury, meet this definition. No one disputes that the first two elements have been established: criminal proceedings were commenced against all plaintiffs, and the proceedings, with the exception of Jose's misdemeanor charge, were terminated in the plaintiffs' favor. The defendants, how-ever, assert that the prosecutor's decision to terminate the case through a *nolle prosequi* motion did not result from a belief that the plaintiffs were innocent. Nothing in the record, however, supports this assertion. At this stage, we repeat, we must take the facts and inferences in the light most favorable to the plaintiffs. Doing so, the only conclu-sion we can reach is that the plaintiffs (other than Jose) have demonstrated at the very least that there is an issue of fact on this point. The same is true for the elements of malice and damages. Finally, the district court's rejection of the plaintiffs' claim against the City was based on its assessment of the remainder of the com-plaint: that is, since it found that the officers had com-mitted no wrongs, there was nothing for which the

City might be vicariously liable. It follows from what we have said that these state-law claims brought by everyone except Jose against the City must also be reinstated on remand.

### III

The theme of this opinion has been the standard for granting summary judgment. This case happens to be one in which the two sides have offered, and supported, two radically different versions of the events. A trial is necessary to resolve the case. We therefore REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion. On remand, Circuit Rule 36 shall apply.