Steven GOMEZ, Plaintiff

v.

Andy LOZANO et al., Defendants.

Case No. 09–22988–CIV.

United States District Court,
S.D. Florida,
Miami Division.

March 13, 2012.

John Bruce Ostrow, Stephen Asher Ostrow, John B. Ostrow, PA, Miami, FL, for Plaintiff.

Joshua Michael Entin, Rosen Switkes & Entin P.L., Robert F. Rosenwald, Jr., City of Miami Beach, Miami Beach, FL, Mendy Halberstam, Jackson Lewis, LLP, Miami, FL, for Defendants.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT

ADALBERTO JORDAN, District Judge.

For the following reasons, Raymond Chambers's motion for summary judgment [D.E. 185] is granted, and the motions for summary judgment filed by the City of Miami Beach [D.E. 187] and Julio Blanco and Andy Lozano [D.E. 184] are GRANTED IN PART AND DENIED IN PART. Summary judgment is granted as to Counts I, II, III, IV, V, VI, VII, VIII, IX, XII, XV, and XVIII, and denied with regard to Counts X, XI, XIII, XIV, and XVII.

### I. LEGAL STANDARD

A motion for summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). *Accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d

1278, 1285 (11th Cir.1997). It must also "resolve all reasonable doubts about the facts in favor of the nonmovant." *See United of Omaha Life Ins. v. Sun Life Ins.*, 894 F.2d 1555, 1558 (11th Cir.1990).

## II. FACTUAL BACKGROUND

This case is about the arrest of, and injuries suffered by, Steven Gomez. Mr. Gomez tells one story; Officers Blanco, Chambers, and Lozano tell another; and a grainy cell-phone video and audio recording of the incident tells yet another. At the summary-judgment stage, I must view all evidence in Mr. Gomez's favor. Nonetheless, I need not favor Mr. Gomez's version of events where the recording blatantly discredits Mr. Gomez's testimony. *See Scott v. Harris*, 550 U.S. 372, 380–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The evidence, when properly viewed in Mr. Gomez's favor, reveals the following.

On March 8, 2009, Mr. Gomez and two other friends drove to South Beach, a neighborhood in Miami Beach [D.E. 189–8 at 13–14]. Before they reached their destination, the three men purchased a 12-pack of beer [*Id.* at 14]. They then arrived at Eighth Street and Collins Avenue and parked there [*Id.*].

Before heading out to the beach, the three men headed to a bar on Ocean Drive. Mr. Gomez drank a small, slush, alcoholic drink. Although the drink was small, Mr. Gomez could not finish it [*Id.* at 15]. After this, the men walked to the beach, where they drank beer, met with friends, and relaxed. During this entire time, Mr. Gomez had no more than four alcoholic drinks (including the slush drink) [*Id.* at 13]. He was not, at any point, drunk [*Id.* at 16].

Eventually, Mr. Gomez ran into a female friend of his, who had two other female friends with her. Shortly after these three female friends arrived, Mr. Gomez's two male friends left [D.E. 189–9 at 10].

As the afternoon became early evening, Mr. Gomez and his friends decided to leave, so they packed their things. A group of men then began harassing Mr. Gomez's friends. Mr. Gomez told his friends to ignore the group, a comment that the group apparently overheard. For some reason, this comment agitated the group [*Id.*].

Mr. Gomez, unaware that the group of men had become agitated, began to leave the beach. The group, though, began yelling with more energy and vehemence. The spike in rancor caused Mr. Gomez to turn around, and he noticed that the group now channeled its animosity at him. One man in particular strode toward Mr. Gomez. As the man neared, Mr. Gomez dropped some bags he carried. The man then swung at Mr. Gomez, but Mr. Gomez stepped back and avoided the punch; the man fell from his own imbalance [*Id.* at 12].

Mr. Gomez then observed three more men from the group walking quickly in his direction. Sensing trouble, Mr. Gomez turned around and hastily headed for the beach's exit [*Id.*]. Jason Hill, another friend of Mr. Gomez, saw him quickly walking out. Mr. Gomez and Mr. Hill then talked, with Mr. Hill informing Mr. Gomez that the group sought only trouble.

Meanwhile, a Miami Beach Police Department Officer named Raymond Chambers arrived at the scene. Pointing at Mr. Gomez, four or five bystanders told Officer Chambers that Mr. Gomez was "involved in a fight and ... getting away" [D.E. 189–15 at 4].[1] Officer Chambers reacted

---

1. Various witnesses testified that a police officer had Mr. Gomez pointed out to him [D.E. 213–3 at 6, 9; D.E. 213–6 at 5].

and began walking after Mr. Gomez [*Id.* at 3–4].

Officer Chambers reached Mr. Gomez and grabbed his arm from behind, though he did not identify himself as a police officer [D.E. 189–9 at 12, 14]. Understandably fearing that one of the rowdy group members had caught up to him, Mr. Gomez struggled to escape, and Officer Chambers reacted by trying to grab Mr. Gomez's arm [*Id.* at 14, 31]. The way Officer Chambers held Mr. Gomez's arm prevented Mr. Gomez from viewing Officer Chambers.

Next, Mr. Gomez was tackled from behind by another police officer, Julio Blanco [D.E. 189–9 at 16]. Mr. Gomez fell face down on the sand. Now a third officer, Andy Lozano, came over and sat on Mr. Gomez's head [*Id.* at 15].

Mr. Gomez has changed his story as to when he noticed that the men around him were police officers. In his affidavit, Mr. Gomez asserts that he did not discover that these men were police officers until he was on the ground [D.E. 221–8 at 2–3]. This assertion contradicts his deposition testimony, however. In his deposition, Mr. Gomez has the following interaction with an attorney.

> *Attorney:* Then during the sequence of events you were able to glimpse and see his uniform and recognize him as a police officer.
>
> *Mr. Gomez:* Yes, for the second that I was able to see him because that's what I—when I tried to shrug [Officer Chambers] grabbed my arm in a hold and when I turned around he went like that real fast, and I was able to get a glimpse and then I stopped resisting, and that's when the other officer came and grabbed me by the feet and took me down.

[D.E. 189–9 at 16]. Mr. Gomez offers no explanation for the change in testimony. Consequently, I need not consider the as-

sertion in the affidavit. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.,* 495 F.3d 1306, 1316 (11th Cir.2007); *Van T. Junkins & Assocs. v. U.S. Indus.,* 736 F.2d 656, 657 (11th Cir.1984).

The evidence, therefore, shows that Mr. Gomez got a glimpse of Officer Chambers as they struggled. Mr. Gomez realized that the person holding his arm was a police officer and stopped resisting [D.E. 189–9 at 16].

In the meantime, a crowd had gathered [D.E. 220–7 at 10]. The crowd, at the very least, was verbally hostile [*Id.* at 10]. In fact, the cell-phone video clearly shows a crowd gathering and shows that the crowd became hostile—one can hear the crowd booing at the officers. Officer Chambers, hearing cursing and yelling, released his hold on the now knocked-down Mr. Gomez and turned his attention to the crowd [D.E. 189–15 at 6]. Officer Chambers had his back to Mr. Gomez, Officer Lozano, and Officer Blanco as the following events unfolded.

Now on the ground, with two police officers on top of him, Mr. Gomez had his face down on the sand and, consequently, could not breathe [D.E. 189–9 at 15]. In an attempt to tell the police officers that he was suffocating, Mr. Gomez squirmed. He did not, however, kick or punch the officers at this time [*Id.* at 17].

Mr. Gomez also testified that he did not flail or move his arms during the incident, but the video discredits this testimony. The cell-phone video shows that Officer Lozano struggled to get Mr. Gomez's arms and hands behind his back. The video, that is, shows Mr. Gomez resisting Officer Lozano's attempts to handcuff him. As this all occurred, not once did the police officers tell Mr. Gomez that he was under arrest or that he should stop resisting [*Id.*]. Mr. Gomez, for his part, was telling

Officers Blanco and Lozano to stop [D.E. 189–10 at 4849].

Eventually, Mr. Gomez got on his knees in an attempt to tell the officers that he needed to breathe. Before he could do anything, however, Officers Blanco and Lozano punched him repeatedly in the ribs [D.E. 189–12 at 8].

Again, contrary to Mr. Gomez's assertion that he did not throw his arms, the video depicts Mr. Gomez's attempt to shove Officer Lozano away. Officer Lozano, in his deposition, stated that he thought Mr. Gomez was trying to punch him. Hence, Officer Lozano says, he punched Mr. Gomez twice in the face. This testimony is consistent with the video. Yet, it is not the only explanation for this use of force.

Everyone agrees that Officer Lozano punched Mr. Gomez in the face twice [D.E. 189–10 at 34; D.E. 189–11 at 23]. Sequentially, the video first shows part of the crowd. It then quickly focuses on Mr. Gomez, who is on his knees. Officers Blanco and Lozano begin to punch Mr. Gomez. Officer Lozano punches Mr. Gomez either in the mouth or on his arm. Mr. Gomez then attempts to push Officer Lozano. Officer Lozano, with a closed-fist, punches Mr. Gomez's face. Suddenly, the crowd again blocks the view of Mr. Gomez and Officers Blanco and Lozano. From the video, I cannot determine whether the visible punch to the face was Officer Lozano's first punch to the face or the second.

Thus, one could view the incident in two ways. First, after Officers Blanco and Lozano began punching Mr. Gomez in the ribs, Mr. Gomez attempted to shove Officer Lozano. Officer Lozano thought that the shove was a punch. In the heat of the moment, he reacted and punched Mr. Gomez in the face twice. Second, Officer Lozano punched Mr. Gomez in the face. Mr. Gomez reacted naturally and tried to protect himself by fending off the attack—i.e., pushing him off. Officer Lozano then punched Mr. Gomez in the face again. A reasonable juror could fairly infer either version from the video and the conflicting testimony. But, because at this stage I must draw all inferences in Mr. Gomez's favor, I infer the second version. Finally, I note that this entire episode began and ended in a matter of seconds.

Mr. Gomez suffered lacerations and two broken teeth and had his eye-socket broken. He now sues Officers Blanco, Chambers, and Lozano, as well as the City of Miami Beach, for his injuries.

### III. ANALYSIS

#### A. FALSE ARREST CLAIM UNDER § 1983

In Counts I, V, and VIII, Mr. Gomez alleges that Officers Blanco, Chambers, and Lozano unlawfully seized him and falsely imprisoned him in violation of 42 U.S.C. § 1983, which provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

A government official who arrests a citizen without a warrant and without probable cause violates the U.S. Constitution, creating a claim under § 1983. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir.2004). A government official may nevertheless assert "qualified immunity," an affirmative defense that protects the official when performing discretionary functions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Officers Blanco, Chambers, and Lozano assert that they have qualified

immunity from Mr. Gomez's § 1983 false-arrest claim. The undisputed facts bear this argument out.

The qualified-immunity analysis first asks if the official acted within his or her discretionary authority. *See Skop v. City of Atlanta,* 485 F.3d 1130, 1136–37 (11th Cir.2007). If the answer is yes, then the plaintiff must show that the official nevertheless does not merit qualified immunity. *See id.* Qualified immunity does not apply where (1) the facts show a constitutional-rights violation, and (2) the law clearly established that right at the time the official violated it. *See Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

No one contests that Officers Blanco, Chambers, and Lozano acted within their discretionary authority. But while Officers Blanco, Chambers, and Lozano ask for qualified immunity, Mr. Gomez maintains that they do not deserve this immunity.

■ In the false-arrest context, an official "is entitled to qualified immunity where that officer had 'arguable probable cause.'" *Davis v. Williams,* 451 F.3d 759, 762 (11th Cir.2006). An official, moreover, has "arguable probable cause" if "reasonable officers in the same circumstances and possessing the same knowledge as the [official] could have believed that probable cause existed to arrest the plaintiff." *Kingsland,* 382 F.3d at 1232. To determine if "arguable probable cause exists," courts must look at the totality of the circumstances. *See Davis,* 451 F.3d at 763.

■ Reviewing the totality of the circumstances here, I find that a reasonable officer in the same circumstances could have believed that probable cause existed to arrest Mr. Gomez. Officer Chambers arrived at a commotion. Then four or five bystanders—all of whom stood at the scene of an apparent crime—pointed at Mr. Gomez and identified him as a brawler [D.E. 189–15 at 34]. *See also supra* footnote 1. Mr. Gomez was walking away from the commotion and the apparent scene of a crime. Nothing suggests that these four or five witnesses had any reason to lie to the police. No evidence indicates that they were in cahoots to get Mr. Gomez in trouble. And nothing shows that these witnesses had any vendetta against Mr. Gomez. More importantly, even if the bystanders fabricated the story, Officer Chambers had no way of knowing as much.

Moreover, the bystanders stated that Mr. Gomez had been involved in a fight. In Florida, a fight may constitute a battery, which is a crime. *See* FLA. STAT. § 784.03. And Florida law allows a police officer to arrest, even without a warrant, a person suspected of committing a battery. *See* FLA. STAT. § 901.15(9)(a). Thus, Officer Chambers had the authority to arrest Mr. Gomez, so long as he had probable cause. And, because four or five neutral witnesses, standing at the scene of a commotion and apparent crime, informed Officer Chambers that Mr. Gomez had committed a battery by fighting, at the very least he had arguable probable cause to arrest Mr. Gomez.

In fact, courts facing analogous circumstances have held that police officers in scenarios analogous to Officer Chambers' had *actual* probable cause to arrest. That is, where a bystander tells a police officer that a suspect committed a crime, courts have found that a police officer has probable cause to arrest the suspect, unless the police officer has some suspicion of the bystander's lack of credibility. *See, e.g., United States v. Burbridge,* 252 F.3d 775, 778 (5th Cir.2001); *Woods v. City of Chi.,* 234 F.3d 979, 996 (7th Cir.2000); *United States v. Smith,* 318 Fed.Appx. 780, 792 (11th Cir.2009); *Whittington v. Town of*

*Surfside*, 490 F.Supp.2d 1239, 1252–53 (S.D.Fla.2007). I agree with these courts and also conclude that Officer Chambers had actual probable cause (or at the very least arguable probable cause) to arrest Mr. Gomez.

Mr. Gomez tries to overcome this conclusion by arguing that Officer Chambers lacked probable cause because he did not actually fight anyone. I am not persuaded.[2]

First, the argument ignores the relevant framework. The question is not, as Mr. Gomez believes, whether he actually committed the crime. The question, rather, is whether, given the totality of the circumstances, a reasonable officer in Officer Chambers's position could have believed that he or she had probable cause to arrest. *See Illinois v. Wardlow*, 528 U.S. 119, 126, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("[P]ersons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent.").[3] As explained above, a reasonable officer in Officer Chambers's position could have believed that he or she had probable cause. Consequently, Mr. Gomez's argument is unpersuasive.

Second, Officers Blanco and Lozano also had probable cause to arrest Mr. Gomez. Florida law makes it a misdemeanor to resist an officer's arrest, even without violence. *See* Fla. Stat. § 843.02. Florida law also allows police officers to make a warrantless arrest when a suspect "has committed a . . . misdemeanor . . . in the presence of the officer." *See* FLA. STAT. § 901.15. No one here disputes that, after Officer Chambers grabbed Mr. Gomez's arm, Mr. Gomez tried to escape from Officer Chamber's control. And Officers Blanco and Lozano saw Mr. Gomez resisting Officer Chambers [D.E. 189–10 at 31; D.E. 189–13 at 26]. Thus, Officers Blanco

---

**2.** In a footnote in his statement of material facts, Mr. Gomez also suggests that Mr. Hill never heard anyone claim that Mr. Gomez was getting away [D.E. 217 at 4 n. 4; D.E. 218 at 4 n. 4; D.E. 219 at 4 n. 3]. At no point, however, does Mr. Gomez make an argument based on this discrepancy. I therefore need not consider the argument. *See Chavez v. Sec'y Fla. Dep't of Corrs.*, 647 F.3d 1057, 1061 (11th Cir.2011) (published opinion) ("The Seventh Circuit memorably said that appellate judges 'are not like pigs, hunting for truffles buried in briefs.' Likewise, district court judges are not required to ferret out delectable facts buried in a massive record . . . .") (citation omitted) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)); *Dunkel*, 927 F.2d at 956 ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim."); *Lisa, S.A. v. Gutierrez Mayorga*, 240 Fed.Appx. 822, 824 (11th Cir.2007) (per curiam) ("Clear presentation [of arguments] is required.").

**3.** In yet another footnote, Mr. Gomez underscores that Officer Blanco saw numerous persons pointing fingers at each other. Yet again, Mr. Gomez makes no explicit argument as to this fact. For that reason alone, I need not consider the assertion. *See Dunkel*, 927 F.2d at 956. Presumably, though, Mr. Gomez is attempting to show that, because so many people were pointing, Officer Chambers had no probable cause to accept the word of the four or five bystanders who pointed at him. But Officer Blanco, who saw different persons point at each other, did not go arrest Mr. Gomez; Officer Chambers did. And Officer Chambers did not testify that bystanders were pointing randomly. He stated that four or five persons pointed at Mr. Gomez, said that Mr. Gomez was involved in the fight, and said that Mr. Gomez was getting away. Mr. Gomez, moreover, does not indicate that Officer Blanco and Officer Chambers were nearby when Officer Chambers heard the persons tell him that Mr. Gomez was getting away. Though I must draw all reasonable inferences in Mr. Gomez's favor, Mr. Gomez must show more than "metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Without context, Mr. Gomez's statement creates nothing more than metaphysical doubt.

and Lozano also had probable cause to arrest Mr. Gomez.

### B. State Law False Arrest, Unlawful Seizure, and False Imprisonment Claims

In Counts II, III, IV, VI, VII, and XVIII, Mr. Gomez alleges that Officers Blanco, Chambers, and Lozano and the City (through the officers) falsely arrested him, unlawfully seized him, and falsely imprisoned him in violation of Florida law.

■ Mr. Gomez's false-arrest and false-imprisonment claims cannot move past this stage. "Probable cause is an affirmative defense to a false arrest claim." *Mailly v. Jenne,* 867 So.2d 1250, 1251 (Fla. Dist.Ct.App.2004). Where the claim is based on an officer's arrest and detention of the plaintiff, probable cause negates a claim for false-imprisonment too. *See Wille v. Raymond,* 487 So.2d 1211, 1212 (Fla.Dist.Ct.App.1986). Indeed, under Florida law, false arrest and false imprisonment are nearly indistinguishable where, as here, they are applied to a police officer's arrest and detention of a suspect. *See Willingham v. City of Orlando,* 929 So.2d 43, 49–50 (Fla.Dist.Ct.App.2006). And "unlawful seizure" appears to be nothing else but a moniker for false arrest and false imprisonment. *See Mathis v. Coats,* 24 So.3d 1284, 1289 (Fla.Dist.Ct.App.2010) (construing claim for "unlawful seizure" as false-arrest and false-imprisonment claims).

As already explained, Officer Chambers had probable cause to arrest Mr. Gomez for battery, and, witnessing Mr. Gomez resist Officer Chambers, Officers Blanco and Lozano had probable cause to arrest Mr. Gomez for resisting arrest without violence. Hence, Mr. Gomez's state law false-arrest, unlawful-seizure, and false-imprisonment claims fail.

### C. Excessive Force Under § 1983

In Counts IX and XII, Mr. Gomez also asserts excessive-force claims against Officers Blanco and Lozano under § 1983. Officers Blanco and Lozano, claiming qualified immunity, ask that these claims be dismissed. After viewing the facts in Mr. Gomez's favor, I conclude that Officer Blanco merits qualified immunity, as does Officer Lozano.

As noted earlier, no one disputes that Officers Blanco and Lozano acted with discretionary authority. It therefore becomes Mr. Gomez's burden to show (1) that Officers Blanco and Lozano violated his constitutional rights and (2) that the law clearly established that right at the time. *See Pearson,* 555 U.S. at 232, 129 S.Ct. 808.

■ When making an arrest or stop, officers can use force that is "necessary in the situation at hand," but they violate a constitutional right if they use excessive force. *See Lee v. Ferraro,* 284 F.3d 1188, 1197 (11th Cir.2002). The force applied should not exceed the force a reasonable officer would believe is necessary under the circumstances. *See Penley v. Eslinger,* 605 F.3d 843, 849 (11th Cir.2010). When deciding whether an officer used excessive force, courts make a fact-sensitive inquiry. *See id.* at 850. Factors such as the severity of the crime, the risk of flight, and the danger to the officer all weigh in. *See Lee,* 284 F.3d at 1198. Nonetheless, courts cannot apply these factors mechanically. *See Penley,* 605 F.3d at 850. Courts, moreover, must keep in mind that police officers make split-second decisions (as was the case here) in tough, tense situations. *See Jean–Baptiste v. Gutierrez,* 627 F.3d 816, 820 (11th Cir.2010).

■ Officer Blanco did not use excessive force. To begin with, the crime that

Mr. Gomez allegedly committed—resisting Officer Chambers's arrest—while not severe, is not minor. And though I understand that Mr. Gomez maintains that he struggled only because (1) he did not know who grabbed his arm and (2) the police officers were suffocating him, Officer Blanco could certainly believe otherwise. After all, Officer Blanco was attempting to control Mr. Gomez's feet, not his upper body, so a reasonable officer had no way of knowing that Mr. Gomez was suffocating. Next, though Mr. Gomez's risk of flight was minor, for numerous officers surrounded him, Officer Blanco could feel some threat from Mr. Gomez. Mr. Gomez began by resisting Officer Chambers, and after being tackled, he began squirming and trying to escape from Officers Chambers's and Blanco's holds [D.E. 189–9 at 14, 31]. And although neither Officer Blanco nor Officer Lozano told Mr. Gomez to stop resisting [D.E. 221–8 at 3], Mr. Gomez escaped their holds, getting up to his knees. A reasonable officer in Officer Blanco's position, therefore, could reasonably believe that Mr. Gomez was resisting and attempting to fight back, posing a risk.

Given these circumstances and the speed of events, Officer Blanco's force—which consisted of punches to Mr. Gomez's ribs—was not excessive. In the heat of the moment, after watching Mr. Gomez resist Officer Chambers, after feeling him squirm and try to escape, and after seeing him get on his knees, a reasonable officer could believe that punches to the ribs were necessary to coax a suspect into surrender. And so qualified immunity applies to Officer Blanco. *See Lawrence v. Bloomfield Twp.*, 313 Fed.Appx. 743, 748 (6th Cir. 2008).

Finally, with regard to Officer Blanco's use of force, some witnesses testified that the officers kicked or kneed Mr. Gomez [D.E. 220–3 at 11; D.E. 220–4 at 7; D.E. 220–9 at 6; D.E. 220–12 at 8]. This testimony fails to identify which officer kicked or kneed Mr. Gomez, so, presumably, Officer Blanco might have kicked Mr. Gomez. But Mr. Gomez's claims for excessive force are based on Officers Blanco's and Lozano's punching, not their kicking [D.E. 70 ¶ 1718, 96, 105–06, 122, 131]. Therefore, this evidence is irrelevant to the claim. Also, in his deposition, Mr. Gomez mentions punches; not once does he mention that the Officers kicked him.[4] Mr. Gomez cannot attempt to create a genuine dispute as to a material fact by introducing the testimony of non-parties when that testimony contradicts his own. *See Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir.1995); *Adelman–Tremblay v. Jewel Cos.*, 859 F.2d 517, 521 (7th Cir.1988); *Santhuff v. Seitz*, 385 Fed.Appx. 939, 945 (11th Cir. 2010) (per curiam). These two reasons bar Mr. Gomez from relying on the possible kicks landed by Officer Blanco.

 Though I find that Officer Blanco did not violate Mr. Gomez's constitutional right through excessive force, I find that Officer Lozano did violate Mr. Gomez's right. True, Mr. Gomez offered some resistance. But, "if the extent of the injury ... [was] serious enough, a jury could conclude that [the police officer] used force in excess of what was reasonable." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir.2000). *See also Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir.2006) ("The deputies' interest, at most, justified only the amount of force that a reasonable officer in the heat of the moment could have believed was needed to end Shreve's passive resistance."); *Meirthew v. Amore*, 417 Fed.

---

4. Officers Blanco and Lozano admit punching Mr. Gomez, but they do not mention kicking him.

Appx. 494, 498 (6th Cir.2011) (finding use of excessive force where officer slammed suspect into booking-room floor when she resisted after being handcuffed).[5] A reasonable jury could conclude that the force used by Officer Lozano was excessive, even if Mr. Gomez minimally resisted.

At no time did Mr. Gomez punch or kick the officers; he merely squirmed and tried to get loose. And yet Officer Lozano responded by punching Mr. Gomez both in the ribs and in the face. In addition, as Officer Lozano admitted, he threw these punches as hard as he could [D.E. 189–10 at 34].[6] The closed-fist punches to the face, moreover, caused severe injuries. Left bloodied and pummeled after the encounter, Mr. Gomez lost his front teeth and suffered a broken orbital cavity [D.E. 221–8 at 3]—all this over Mr. Gomez's minor resistance to arrest. Besides the extreme force used, a reasonable juror could conclude that Officer Lozano, unlike Officer Blanco, should have known that Mr. Gomez was suffocating and squirming because of the suffocation. After all, Officer Lozano sat on top of Mr. Gomez's head.

In a similar situation, the Eight Circuit held that a police officer violated a citizen's constitutional right: the suspect pushed the police officer, and the police officer then punched him in the face. See Rohrbough v. Hall, 586 F.3d 582, 586 (8th Cir. 2009). According to the Eight Circuit, a jury could find the punch excessive even though the suspect pushed the officer. See id. The same reasoning applies here, where Mr. Gomez squirmed and refused to be handcuffed. Given the type of punches thrown by Officer Lozano, the injuries caused by those punches, and Mr. Gomez's minor resistance, I believe that a reasonable jury could find that the use of force was constitutionally excessive.

Officer Lozano relies on two cases, *Wilson v. Flynn*, 429 F.3d 465 (4th Cir.2005), and *Woodruff v. City of Trussville*, 434 Fed.Appx. 852 (11th Cir.2011) (per curiam) (unpublished opinion). But neither holds that a punch to the face can never be excessive force.

In *Wilson*, 429 F.3d at 466, Lowell Wilson's wife and stepdaughter informed the police that Mr. Wilson was tearing up the house and Mrs. Wilson told the police that Mr. Wilson had a loaded gun in the house. And Mr. Wilson had removed his wife's car's spark plug and threatened her, warning that she was not leaving anywhere with his child. See id. at 466–67. When the police officers entered Mr. Wilson's house, a struggle ensued. An audio recording of the incident showed that Mr. Wilson verbally confronted the police and that his daughter pleaded with him to stop resisting. See id. at 467. Under those circumstances, the Fourth Circuit panel held that punching Mr. Wilson in the face and using mace on him did not constitute excessive force. See id. at 468.

But *Wilson* is too dissimilar to this case and is therefore unpersuasive. First, no evidence suggests that Mr. Gomez posed as grave a threat as Mr. Wilson. Mr. Gomez never threatened bystanders; nor did the officers believe that he readily had access to a weapon—especially a deadly weapon like a loaded gun. Second, when the police officers encountered Mr. Gomez he was not going on some rampage; they

---

5. In this context, courts may look at the law of other circuits to decide if an officer violated the constitutional rights of a citizen. *See Kingsland*, 382 F.3d at 1228 & n. 9 (reviewing Fourth and Seventh Circuit cases for this purpose).

6. Officer Lozano's punches contrasts starkly with Officer Blanco's blows. Whereas Officer Blanco tried not to hurt Mr. Gomez when punching him [D.E. 189–12 at 8], Officer Lozano hit Mr. Gomez as hard as he could.

found him slowly walking off the beach. Third, Mr. Gomez, unlike Mr. Wilson, did not threaten, curse, or verbally intimidate the police. In contrast to the facts in *Wilson,* the facts here show that Mr. Gomez merely squirmed and tried to push Officer Lozano off him *after* Officer Lozano punched him once in the face.

*Woodruff* is similarly unhelpful. In *Woodruff,* 434 Fed.Appx. at 854–55, an Eleventh Circuit panel ruled that a police officer's punch to a suspect's face constituted de minimis force, entitling the officer to qualified immunity. But the case—which is unpublished and therefore not binding (though possibly persuasive)—is not dispositive. Significantly, *Woodruff* offers no factual context about the punch to the face. It does not mention, for example, if the police officer punched the suspect with an open hand or closed hand. And the case does not state the strength with which the police officer punched the suspect. Furthermore, I find it difficult to believe that *Woodruff* stands for the broad proposition that every punch to a suspect's face is de minimis force no matter what the circumstances. Given that Officer Lozano admits to punching Mr. Gomez in the face as hard as he could and that he punched Mr. Gomez with a closed fist, I cannot find that Officer Lozano's actions constitute de minimis force as a matter of law.

Although Officer Lozano may have violated Mr. Gomez's constitutional right, Officer Lozano may still merit qualified immunity. At this point, I need to decide whether, at the time of the arrest, the law clearly showed that Officer Lozano's acts violated Mr. Gomez's constitutional rights. *See Galvez v. Bruce,* 552 F.3d 1238, 1244 (11th Cir.2008); *Lee,* 284 F.3d at 1199. Mr. Gomez bears the burden of showing that the law in this situation was clearly established. *See Skop,* 485 F.3d at 1136–37.

In his response, Mr. Gomez never raised or briefed the clearly established-law issue. Having agreed that Officer Lozano acted with discretionary authority, Mr. Gomez had the burden, even at the summary-judgment stage, "to show that qualified immunity should not apply." *Lewis v. City of W. Palm Beach,* 561 F.3d 1288, 1291 (11th Cir.2009). Mr. Gomez's burden includes the burden of showing that the law clearly established Mr. Gomez's right at the time Officer Lozano punched Mr. Gomez. Mr. Gomez did not meet this burden. Therefore, qualified immunity attaches to Mr. Lozano.

 Even if I independently considered the clearly established-law issue, I would hold that qualified immunity attaches. The law clearly establishes a constitutional right in two situations. First, the law establishes the right where, before the alleged violation, Supreme Court or Eleventh Circuit precedent "has staked out a bright line" defining the right. *See Hoyt v. Cooks,* 672 F.3d 972, 977 (11th Cir.2012) (published opinion). Second, it establishes the right if the police officer's conduct goes "so far beyond the hazy border between excessive and acceptable force" such that "every reasonable officer would conclude that the excessive force used was plainly unlawful." *See Lewis,* 561 F.3d at 1292.

A review of Eleventh Circuit case law does not show a bright line barring Officer Lozano's conduct. To the contrary, the Eleventh Circuit has offered police officers wide discretion in reacting with force when the police officer believes that a suspect resists arrest. *See, e.g., Hoyt,* 672 F.3d at 977–78 (holding that there was no clearly established law when suspect refused to allow officers to handcuff him and when suspect died after prolonged taser usage because precedent had not staked out a bright line); *Brown v. City of Huntsville,*

608 F.3d 724, 739 (11th Cir.2010) ("[T]he use of pepper spray is not excessive force in situations where the arrestee ... physically resists arrest ...."); *Lewis,* 561 F.3d at 1288, 1292 (applying qualified immunity where suspect died after police officers hogtied him because suspect offered minor struggle and because courts should not second guess police officers' conduct in rapidly evolving situations).

Nor can I find that *"every* reasonable officer would conclude that the excessive force used was plainly unlawful." *Lewis,* 561 F.3d at 1292 (emphasis added). As one Eleventh Circuit panel stated: "The circumstances that call on police to use some intermediate force—between no force and deadly force—remain the cases where the law of excessive force is most ambiguous." *Buckley v. Haddock,* 292 Fed.Appx. 791, 798 (11th Cir.2008).[7]

Recently, an Eleventh Circuit panel held that qualified immunity attached where officers could not handcuff a suspect who resisted by stretching his arms so as to prevent the handcuffing. The police officers repeatedly used a taser on the suspect, despite the suspect's minor resistance, and the suspect died. *See Hoyt,* 672 F.3d at 977–78. The law did not clearly establish the suspect's constitutional rights, nor did the force exceed the hazy border. *See id.* The force used in that

case and here are not equal, but they are somewhat similar. The level of resistance is analogous. And so I cannot conclude that Officer Lozano's actions exceeded the hazy border between acceptable and excessive force. Qualified immunity therefore attaches to Officer Lozano.

### D. FAILURE TO INTERVENE CLAIM UNDER § 1983

█ Against Officer Chambers, in Count XV, Mr. Gomez also brings a claim for failure to intervene in violation of § 1983. Mr. Gomez claims that, by failing to stop Officers Blanco's and Lozano's attack on him, Officer Chambers is liable for nonfeasance. I disagree.

█ A police officer who never hits a suspect yet never prevents another officer's use of excessive force violates § 1983. *See, e.g., Velazquez v. City of Hialeah,* 484 F.3d 1340, 1341–42 (11th Cir.2007) (per curiam); *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1442 (11th Cir.1985). But that police officer must have the ability to intervene. *See Hadley v. Gutierrez,* 526 F.3d 1324, 1331 (11th Cir.2008). The plaintiff, of course, must set forth some evidence showing that the police officer could anticipate and stop the show of excessive force. *See id.*

Officer Chambers could not stop Officer Lozano's alleged excessive force. He

---

**7.** Eleventh Circuit precedent supports this statement. No Eleventh Circuit opinion has denied qualified immunity for use of disproportionate force in a case where a suspect continuously "resists" arrest. To the contrary, the Eleventh Circuit has found force to exceed the hazy border as "disproportionate" where the suspect offered no resistance but was nonetheless hit, where the suspect stopped resisting and the police continued attacking for a prolonged period, or where the suspect merely verbally abused the police officer and the officer used force. *See, e.g., Galvez v. Bruce,* 552 F.3d 1238, 1243 (11th Cir.2008) (holding no qualified immunity for disproportionate and unnecessary force used

on handcuffed and compliant suspect); *Reese v. Herbert,* 527 F.3d 1253, 1274 (11th Cir. 2008) (holding beating as disproportionate and beyond hazy border where suspect offered no resistance); *Lee,* 284 F.3d at 1199 (11th Cir.2002) (finding violence grossly disproportional where officer used force after verbally abusive suspect was handcuffed and completely secured); *Priester v. City of Riviera Beach,* 208 F.3d 919, 927 (11th Cir.2000) (denying qualified immunity where police officer had police dog bite leg of suspect who originally fled but complied with police orders before police unleashed the dog). Here, it is undisputed that Mr. Gomez squirmed throughout.

found himself at the scene of a brawl. The video recording shows that a large crowd gathered around the scene. Officer Chambers turned around to deal with the crowd after Officer Blanco tackled Mr. Gomez. Even the witness on whose testimony Mr. Gomez relies in order to create a dispute about the crowd's hostility acknowledged that the crowd was verbally hostile [D.E. 220–7 at 10]. Boos, emanating from the crowd, are audible in the video recording. The entire incident lasted a few seconds (about 11 according to the video). Mr. Gomez, moreover, does not marshal proof of any sort that Officer Chambers saw the excessive force.[8] The crowd was hostile, it all happened in seconds, and Officer Chambers was not even aware of the violence—the only reasonable inference is that Officer Chambers could not intervene. *See Ensley v. Soper,* 142 F.3d 1402, 1407 (11th Cir.1998). Hence, summary judgment is merited.

Mr. Gomez cites two cases—*Gonzalez v. City of Elgin,* 578 F.3d 526, 540 (7th Cir. 2009), and *McKay v. Guglielmo,* No. 85–cv–356, 1989 U.S. Dist. LEXIS 10761, at *8–9 (S.D.N.Y. Sept. 12, 1989)—to argue that Officer Chambers can nonetheless be held liable under the failure-to-intervene theory. Neither case, however, is apposite.

In *Gonzalez,* 578 F.3d at 540, certain officers were not attempting to control a hostile crowd as other officers attacked the plaintiffs. The record showed that their was no mob activity, and the video evidence showed that police officers were lackadaisical, moseying around as other officers beat and attacked the plaintiffs. Unlike the officers in *Gonzalez,* Officer Chambers was preoccupied controlling a rowdy crowd.

And in *McKay,* 1989 U.S. Dist. LEXIS 10761, at *1–2, a police officer had his back turned while another officer beat the plaintiff in a small locker-room area. The officer with his back turned, moreover, had no reason to turn his back. That is, the officer willfully blinded himself to the abuse. By contrast, Officer Chambers turned his back in an attempt to control a hostile crowd. Nothing suggests that Officer Chambers willfully turned his back to ignore Mr. Gomez's arrest and the subsequent events. *McKay* and *Gonzalez,* therefore, are inapposite.

### E. ASSAULT AND BATTERY CLAIMS UNDER STATE LAW

Mr. Gomez also bring claims for assault and battery against Officers Blanco and Lozano in Counts X, XI, XIII, and XIV. In Count XVII, Mr. Gomez seeks to hold the City (for Officers Blanco's and Lozano's actions) liable for assault and battery.

Florida law defines an assault as "an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril." *Sullivan v. Atl. Fed. Sav. & Loan Ass'n,* 454 So.2d 52, 54 (Fla.Dist.Ct.App.1984). And a battery is defined as "the intentional infliction of a harmful or offensive contact upon the person of another." *Id.* Police officers, however, get more leeway. They receive a presumption of good faith in Florida, and they are liable for battery only if they use excessive force when making a lawful arrest. *See City of Miami v. Sanders,* 672

---

8. In his statement of material facts, and citing a deposition, Mr. Gomez maintains that Officer Chambers admitted that he "observed Blanco and Lozano's subsequent actions" [D.E. 218 at 7]. This statement is grossly inaccurate. In the page cited by Mr. Gomez, Officer Chambers stated that he did *not* pay close attention to what was happening behind him [D.E. 221–4 at 11]. In the same deposition, Officer Chambers unequivocally explained that he did not see Officer Lozano sit on Mr. Gomez's head, Officer Blanco punch Mr. Gomez, or Officer Lozano strike Mr. Gomez [*Id.* at 8].

So.2d 46, 47 (Fla.Dist.Ct.App.1996). "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Id. See also City of Miami v. Albro,* 120 So.2d 23, 26 (Fla. Dist.Ct.App.1960) ("The limit of the force to be used by the police is set at the exercise of such force as reasonably appears necessary to carry out the duties imposed upon the officers by the public"). At the same time, police officers have immunity from liability if an injury arose during the commission of a forcible felony. *See* FLA. STAT. § 776.085.

Officers Blanco and Lozano and The City underscore that the "excessive force" test under Florida law sounds eerily similar to the "excessive force" formulation under federal law. Accordingly, they argue, because they did not use excessive force under the § 1983 rubric, they did not use excessive force under Florida law. However, as noted above, a reasonable jury could find that Officer Lozano used excessive force. But, even if he had not, this argument wrongly assumes that the same "excessive force" standard applies to the § 1983 claims and the Florida assault and battery claims.

The cases cited by the City do not help its position. In *Dixon v. State,* 101 Fla. 840, 132 So. 684, 688 (1931), on which the City relies, for example, the Supreme Court of Florida stated that "where [a police officer] is charged with exceeding that limit [of reasonable force], the jury must judge of the necessity." Similarly, the Eleventh Circuit has recognized that, under Florida law, the question of whether a police officer used "reasonably necessary force" is a question for a jury. *See Ansley v. Heinrich,* 925 F.2d 1339, 1341 (11th

Cir.1991) (citing *City of Winter Haven v. Allen,* 541 So.2d 128, 138 (Fla.Dist.Ct.App. 1989)).

▬ Officers Blanco and Lozano and The City also argue that, because Mr. Gomez violently resisted arrest—a forcible felony under Fla. Stat. § 843.01—they are immune from liability under Fla. Stat. § 776.085. This argument too is unconvincing.

A suspect resists an officer with violence when he "(1) knowingly (2) resisted, obstructed, or opposed a law enforcement officer (3) who was in the lawful execution of any legal duty (4) by offering or doing violence to his person." *Yarusso v. State,* 942 So.2d 939, 940 (Fla.Dist.Ct.App.2006). Here, Officers Blanco and Lozano were executing their legal duties, and Mr. Gomez knew that they were police officers. The facts, when viewed in the light most favorable to Mr. Gomez, show that Mr. Gomez obstructed the arrest by squirming and trying to get free. Under Florida law, a suspect need not strike a police officer to do violence on an officer's person. Struggling and wiggling *may* be enough. *See Wright v. State,* 681 So.2d 852, 852–54 (Fla.Dist.Ct.App.1996) (struggling, kicking, and flailing arms suffices for criminal charge); *State v. Green,* 400 So.2d 1322, 1323 (Fla.Dist.Ct.App.1981) (wiggling and struggling enough for charge). But on this record whether Mr. Gomez's squirming here constitutes obstruction "by offering or doing violence to [the Officers'] person[s]," *Yarusso,* 942 So.2d at 940, is a question for a jury to decide, *see Green,* 400 So.2d at 1323.

▬ Finally, Officers Blanco and Lozano argue that, under Fla. Stat. § 768.28, they are immune from liability.[9] That statute states:

9. The City did not seek immunity under § 768.28(9), which states, in part, that "[t]he state or its subdivisions" are not liable for "the acts or omissions" of an agent "commit-

ted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful

No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

FLA. STAT. § 768.28. Because no evidence suggests that they acted in bad faith or with malice, Officers Blanco and Lozano assert that they are immune. Yet this argument ignores the language of the statute, which allows an officer to "be held personally liable in tort" for actions taken "in a manner exhibiting wanton and willful disregard of human rights." *Id.* In Florida, the level of violence used by a police officer allows a jury to conclude that a police officer acted with wanton and willful disregard of human rights. *See Thompson v. Douds,* 852 So.2d 299, 309 (Fla.Dist.Ct. App.2003). As a result, whether Officers Blanco and Lozano wantonly and willfully disregarded Mr. Gomez's human rights is a question left to a jury.

## IV. CONCLUSION

For these reasons, Officer Chambers's motion for summary judgment [D.E. 185] is GRANTED, and Miami Beach's [D.E. 187] and Officers Blanco's and Lozano's motions for summary judgment [D.E. 184] are GRANTED IN PART AND DENIED IN PART.