[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-10771
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 27, 2012
JOHN LEY
CLERK

D. C. Docket No. 5:09-cv-00026-LGW-JEG

MARTHA HOYT,
Individually, and as Administrator of the
Estate of James Christopher Allen,
JAMES ALLEN,

Plaintiffs - Appellees,

versus

BERNARD COOKS,
In his individual capacity,
RANDY T. HARKLEROAD,
In his individual capacity,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(February 27, 2012)

Before EDMONDSON and ANDERSON, Circuit Judges, and EDENFIELD,*
District Judge.

_____

* Honorable B. Avant Edenfield, United States District Judge for the Southern District of
Georgia, sitting by designation.

ANDERSON, Circuit Judge:

In May 2007, Bacon County Deputy Bernard Cooks and Alma Police Officer Randy Harkleroad repeatedly used their Tasers in an attempt to subdue and arrest a struggling James Christopher Allen ("Allen"), who died shortly thereafter while being transported to jail. In May 2009, Martha Hoyt and James Allen ("Plaintiffs") brought suit individually and on behalf of Allen's estate. Plaintiffs sued Bacon County, Georgia; Bacon County Sheriff Richard Foskey; the city of Alma, Georgia; Alma Police Chief Tom Taggart; Cooks; and Harkleroad (collectively, "Defendants"). The claims included excessive force, denial of medical care, violations of the Americans with Disabilities Act, assault, battery, negligence, and wrongful death.

After discovery, the district court granted summary judgment to Defendants on many of the claims. The only claims that survived summary judgment were Plaintiffs' excessive force, assault, and battery claims against Cooks and Harkleroad; and negligence and wrongful death claims against Harkleroad. On the excessive force action brought under 42 U.S.C. § 1983, the district court denied qualified immunity to Cooks and Harkleroad. On the state law actions, the district court denied official immunity under Georgia law. Cooks and Harkleroad have filed an interlocutory appeal to this Court.

## I. FACTS[1]

At around 2:02 a.m. on May 9, 2007, Cooks was driving his patrol car in Alma, Georgia, when he received word from dispatch that Allen had called 911 three times from his residence. Allen told the dispatcher that he was being sewn up in a suit and that demons were trying to get him.

At around 2:16 a.m., Cooks arrived at Allen's residence, drove up the driveway, and rolled down his car's front driver-side window. While screaming that demons were trying to get him, Allen ran out of the house towards the patrol car and yelled that Cooks was a demon who needed to be killed. Allen then lunged into Cooks's patrol car through the open window and grabbed at Cooks's shirt. Cooks pushed Allen away and moved the patrol car forward to dislodge him.

Cooks exited his patrol car and asked Allen what he was doing. Allen repeated that demons were trying to get him and that Cooks was a demon. Cooks unholstered his model X26 Taser. Allen began crawling towards Cooks, who retreated to his patrol car and called for assistance at around 2:17 a.m. Allen continued to crawl towards Cooks, who told Allen to lie down and be still. Allen

---

[1] We state the facts based on our own review of the record in the light most favorable to Plaintiffs. Johnson v. Clifton, 74 F.3d 1087, 1091 (11th Cir. 1996). We gather most of the facts from the summary that Cooks and Harkleroad gave to Georgia Bureau of Investigation Special Agent J. Kirk Smith because this is the approach advocated by Plaintiffs themselves and because we believe that Smith's account contains the most plaintiff-friendly version of the facts.

obeyed and lay down.

While waiting for backup to arrive, Cooks had his Taser drawn and made no effort to arrest Allen, who would occasionally try to get up but would lie down again when Cooks ordered him to do so. Harkleroad, who had been deputized to assist Bacon County sheriffs, arrived as back-up at around 2:27 a.m. At that point, Cooks holstered his Taser, which had not yet been activated, and told Harkleroad that Allen needed to be handcuffed and taken to jail.

Cooks repeatedly ordered Allen, who was still lying on the ground, to place his hands behind his back. However, Allen would place just his one hand behind his back while keeping the other hand outstretched. Harkleroad got on his knees and tried to grab Allen's arms, but Allen continued to resist and would not allow both arms to be put behind his back.

Due to the difficulty in trying to handcuff Allen, Cooks unholstered his Taser, shot a set of flying probes into Allen's lower back, and discharged the device.[2] The officers again ordered Allen to put both arms behind his back, but he still kept his arms outstretched, refusing to let the officers handcuff him.[3] Cooks

---

[2]     Cooks's and Harkleroad's summaries disagree on the precise order in which they stunned Allen. We use the version that is most favorable to Plaintiffs.

[3]     Plaintiffs' expert Melvin Tucker believes that Allen was experiencing "excited delirium," a drug-induced condition in which a person tends to exhibit "1. imperviousness to pain; 2. great strength; 3. hyperthermia; 4. profuse sweating; 5. bizarre behavior; 6. aggression; 7.

4

then used the Taser against Allen's leg in "dry stun mode,"[4] where the device was pressed directly against Allen's skin to produce a burning sensation. Both officers were on their knees during their attempts to handcuff Allen, but he continued to roll around on the ground and refused to let the officers grab his arms and handcuff them. After several dry stuns, the officers were able to get handcuffs on one of Allen's hands but were unable to handcuff both hands.

Allen continued to struggle and to ignore the officers' commands. Unable to get Allen to comply, Cooks again used his Taser in dry stun mode on Allen's leg. As Cooks tried to complete the handcuffing, Harkleroad unholstered his model M26 Taser and applied several additional dry stuns to Allen. During the entire sequence, the officers repeatedly ordered Allen to put his arms behind his back and tried to complete the arrest. Cooks and Harkleroad decided that their stuns were not having the desired effect, and the officers ceased using the Tasers. Cooks was

---

hyperactivity; 8. hallucinations; and 9. confusion and disorientation." Dkt. 39 at 7-8.

[4] "Dry stun mode" is also known as "drive stun mode." Plaintiffs' expert described the difference between the probes and dry stun:

> The [Taser] was classified as an electro-muscular disruptor when used to fire small probes attached to the weapon with thin wires because, in that mode, it overrides the central nervous system and makes muscle control impossible. The TASER can also be used as a pain compliance weapon in what is called the "drive stun" mode. In the "drive stun" mode, the weapon is pressed against a person's body and the trigger is pulled resulting in pain (a burning sensation) but the "drive stun" mode does not disrupt muscle control.

Dkt. 39 at 6-7.

then able to get Allen's other hand handcuffed by physical force.

Allen asked why he was handcuffed, to which Cooks responded that Allen was under arrest for felony obstruction. Allen stated that he did not want to go to jail. He refused to walk, so Cooks and Harkleroad carried him to Cooks's car. The officers searched Allen and found no weapons or drugs. Allen was placed in the back seat of Cooks's patrol car, and Cooks secured Allen's residence.

With Harkleroad following in his own patrol car, Cooks and Allen departed the scene en route to the Bacon County Sheriff's Office at around 2:41 a.m. During the trip, Allen asked how much longer until they arrived, to which Cooks replied that it would be a few more minutes. Upon arrival at the Sheriff's Office, Allen did not respond when Cooks tried to rouse him. Harkleroad retrieved ammonia capsules from a nearby EMT, but these also had no effect. Cooks pulled Allen from the car and found no pulse. CPR was performed, and Allen was then placed in an ambulance and taken to Bacon County Hospital, but he was pronounced dead upon arrival. The cause of death was listed as "cocaine-induced excited delirium in a background of coronary atherosclerotic disease."

Cooks said that he had stunned Allen once with the probes and two times in dry stun mode, although his Taser data download showed that the device had been activated twelve times. Harkleroad said that he had stunned Allen three times in

6

dry stun mode, but his Taser's data download showed that it had been activated six times. The record shows that an "activation" of the Taser does not mean that the Taser actually touched or stunned Allen. In any event, the more significant fact is that Allen was tased only once in the prong mode, and that all subsequent tasings were in the dry stun mode.[5]

Cooks stated that Allen had drug problems for the last twelve or thirteen years. Cooks had been called to Allen's residence eight or nine times in the past, usually in the early morning hours when Allen would call 911 and say that he was seeing demons or was being assaulted. During past encounters, Allen had been verbally aggressive towards Cooks but had never been physically aggressive.

## II. QUALIFIED IMMUNITY

Plaintiffs claim that Cooks and Harkleroad violated the Fourth and Fourteenth Amendments by using excessive force in their attempt to arrest Allen. Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002). Cooks and Harkleroad argue that they are entitled to qualified immunity.

We have jurisdiction over this interlocutory appeal because the case "presents the 'core qualified immunity' analysis of whether the facts, viewed in the

---

[5] As discussed below, the record in this case reveals a stark contrast between the prong mode (which overrides the central nervous system and disrupts muscle control) and the much less serious dry stun mode (which results merely in pain, a burning sensation).

light most favorable to Plaintiffs, establish that [Cooks and Harkleroad] violated [Allen's] constitutional rights." Grider v. City of Auburn, 618 F.3d 1240, 1253 n.18 (11th Cir. 2010). We review de novo a district court's resolution of qualified immunity on summary judgment, taking all facts in the light most favorable to the non-movants. Lee, 284 F.3d at 1190.

"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 1193-94 (quotations omitted). Qualified immunity is intended to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Id. at 1194 (quotations and citations omitted).

Cooks and Harkleroad must first establish that they were performing discretionary acts, which is undisputed here. Id. The court must then grant qualified immunity unless the facts taken in the light most favorable to Plaintiffs show (1) that there was a violation of the Constitution and (2) that the illegality of Cooks's and Harkleroad's actions was clearly established at the time of the incident. Id.

The Supreme Court has stated that we have discretion in deciding which of those two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009). Because we find that the illegality of Cooks's and Harkleroad's behavior was not clearly established at the time, we need not decide whether there was a constitutional violation. Id.

The inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011). The right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987). "We have said many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000) (quotations omitted). In determining whether a right is clearly established, we look to the precedent of the Supreme Court of the United States, of this Court, and of the relevant state's highest court. McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).

In this case, there is no precedent that has staked out a bright line. Plaintiffs produce two cases, but both are inapposite. Plaintiffs' first case is Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004), where an officer used a single probe-

9

style Taser stun on a truck driver who was "hostile, belligerent, and uncooperative." Id. at 1278. However, Draper did not establish that any particular behavior would violate the Constitution. Indeed, it found that the officer's actions were constitutional. Id. Also, Draper is distinguishable, primarily because the officers in that case were able to handcuff the suspect after just one use of the Taser, whereas Cooks and Harkleroad were unable to fully handcuff Allen even after repeated stuns. Id. at 1273-74. Accordingly, Draper did not give Cooks and Harkleroad fair warning that their behavior would constitute excessive force. See Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002).

The only other case Plaintiffs cite to support the argument that the illegality of Cooks's and Harkleroad's actions was clearly established is Oliver v. Fiorino, 586 F.3d 898 (11th Cir. 2009). However, Oliver was issued in October 2009, and thus it cannot have put Cooks and Harkleroad on notice that their behavior in May 2007 could constitute excessive force. Hope, 536 U.S. at 741, 122 S. Ct. at 2516 (noting that the proper inquiry is "whether the state of the law [on the date of the incident] gave respondents fair warning that their alleged treatment of [the suspect] was unconstitutional"). Accordingly, Plaintiffs have produced no caselaw that put Cooks and Harkleroad on notice that their actions would violate a clearly established right.

10

However, Plaintiffs are correct in arguing that a right can be clearly established even in the absence of caselaw. Priester, 208 F.3d at 926. For there to be such "obvious clarity" that an officer's conduct would violate a clearly established right even in the absence of caselaw, the conduct must have been "so far beyond the hazy border between excessive and acceptable force that [the officer] had to know he was violating the Constitution." Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997). This would require that every reasonable officer in Cooks and Harkleroad's position would inevitably conclude that the force was unlawful. Priester, 208 F.3d at 926-27. Oliver was such a case, and Plaintiffs argue that it is very similar to the facts of this appeal.[6]

When determining whether force was excessive and unreasonable, we look to several factors, including the severity of the crime at issue, whether the suspect posed an immediate threat, and whether the suspect actively resisted arrest. See Oliver, 586 F.3d at 905-07. This is done "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 905.

_____

[6] Although the Oliver opinion was issued after the incident here, it is relevant because it held that the conduct of the officers there rose to the level of a constitutional violation as a matter of obvious clarity. Thus, if the conduct of Cooks and Harkleroad were identical to, or substantially similar to, the actions condemned in Oliver, then what was a matter of obvious clarity two years later in Oliver might indicate that such similar actions would also violate clearly established rights even two years earlier. However, as noted below, the conduct of Cooks and Harkleroad was neither identical to nor substantially similar to that of the officers in Oliver. See infra.

11

A. Severity of Crime Committed

In Oliver, Anthony Oliver "was not accused of or suspected of any crime, let alone a violent one." Id. at 908. Here, however, Allen had just recently committed assault and battery on a police officer by lunging through the patrol car window and grabbing the officer's shirt while threatening to kill him. Clark v. State, 714 S.E.2d 736, 737 (Ga. Ct. App. 2011) ("Under OCGA § 16-5-20(a), a person commits the offense of simple assault when he either (1) attempts to commit a violent injury to the person of another; or (2) commits an act which places another in reasonable apprehension of immediately receiving a violent injury.") (quotations and alterations omitted); Williams v. State, 651 S.E.2d 347, 349 (Ga. Ct. App. 2007) ("In Georgia, a person commits simple battery when he intentionally makes physical contact of an insulting or provoking nature with the person of another.") (quotations and alterations omitted). Besides being an assault and battery on a law enforcement officer, Allen's behavior also amounted to obstruction. Long v. State, 583 S.E.2d 158, 159 (Ga. Ct. App. 2003) ("A person commits the offense of obstruction of a law enforcement officer when he knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties.") (quotations omitted). Against the background of whether every reasonable officer would have inevitably concluded that the force was unlawful,

12

this factor weighs in favor of Cooks and Harkleroad.  Priester, 208 F.3d at 926-27; Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002) ("Generally, more force is appropriate for a more serious offense and less force is appropriate for a less serious one.") (quotations omitted).

B. Threat Posed

In Oliver, the decedent "did not act belligerently or aggressively" towards officers, by-standers, or himself.  Oliver, 586 F.3d at 908.  Here, however, only a brief period of time had passed since Allen's very aggressive actions towards Cooks.  Allen's acts were contemporaneous with repeated threats to kill Cooks, whom Allen believed to be a demon.  Also weighing against Allen is the fact that Cooks waited for back-up to arrive so he could have assistance in making the arrest.  Further, Allen continued to pose a danger during the time when only one of his hands was handcuffed; without both hands shackled, the single handcuff could be used as a weapon.

This combination of an assault, battery, very unusual behavior, and threats to kill Cooks[7] would weigh against a conclusion that Cooks's and Harkleroad's behavior was "so far beyond the hazy border between excessive and acceptable

_____

[7]    As noted supra at footnote 3, Plaintiffs' expert believes that Allen was likely in a state of "excited delirium," the symptoms of which include imperviousness to pain, great strength, bizarre behavior, aggression, and hallucinations.

13

force" that they had to know they were "violating the Constitution even without caselaw on point." Mattox, 127 F.3d at 1419.

C. Level of Resistance

In Oliver, the decedent "complied with most of the officers' directions." Oliver, 586 F.3d at 908. Nonetheless, an officer continued to use probe-style stuns on the decedent "while he was writhing in pain on the hot pavement and after he had gone limp and immobilized." Id.

Here, however, Allen resisted during the entire time that Cooks and Harkleroad tried to handcuff him. He spread his arms apart to prevent being handcuffed, and he rolled around to keep his arms from being pulled behind his back. Even after repeatedly using their Tasers, Cooks and Harkleroad had considerable difficulty in effecting the arrest. Again, this factor weighs in favor of finding that the force was not so excessive as to rise to the level of obvious clarity.

D. Balance of Interests

Lastly, we consider "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake." Id. at 905. In Oliver, after one probe-style stun, Oliver was brought to the ground, and after several more stuns, he was lying on the hot asphalt, screaming in pain. Id. at 903. The officer reloaded another cartridge

14

and stunned him again.  Id.  Even though Oliver was completely immobilized, he was subjected to yet another stun.  Id.  The officers on scene made no attempt to arrest or subdue him between stuns.  Id. at 908.

The conduct of Cooks and Harkleroad is nothing like the conduct of the officers in Oliver.  There, the officers repeatedly tased Oliver in the probe mode.  Id. at 901 (at least eight times); id. at 903 (in the probe mode).  By contrast, Cooks and Harkleroad tased Allen only once in the probe mode.[8]  All subsequent applications were in the dry stun mode, a much less serious application which (according to Plaintiffs' own expert witness) does not override the central nervous system and does not disrupt muscle control.  Rather the dry stun mode results only in pain, a burning sensation.  Furthermore, in Oliver, the first stun "brought Oliver to the ground."  Id. at 903.  Although Oliver "never got back up, . . . never hit, kicked, punched or threatened the officer," id., the officer tased Oliver twice more (in the prong mode) after which Oliver was "lying on the scorching hot asphalt screaming in pain that it was 'too hot.'"  Id.  When Oliver "tried to sit up, he flopped down like a 'wet cloth' because he had no control over his body."  Id.

---

[8]      This first use of the Taser, the only use in the probe mode, was clearly a reasonable use of force under the instant circumstances, which provide at least as much support for the Taser use as the circumstances which we held reasonable in Draper, 369 F.3d at 1272-73, 1278.

15

Nevertheless, the officer noticed that one of the Taser wires had become disconnected from the Taser prong, and the officer "loaded a second cartridge into her Taser and began tasing Oliver again" three or four more times, and then a final time after he was "totally immobilized, leaving him clenched up and lying on his back." Id. at 903, 908. By contrast, Allen never ceased his vigorous resistance to the attempts to handcuff him. Cooks testified that the tasing seemed to have no effect and that Allen never said that the tasing hurt. And the officers here did not tase Allen, even in the dry stun mode, after Allen ceased resistance, and certainly not after Allen had lost control of his body (like a "wet cloth") or was "totally immobilized." Finally, the officers in this case, unlike the officers in Oliver, repeatedly attempted to handcuff Allen between the tasing attempts, but were unable to do so because of Allen's continued resistance.

Thus, the facts in Oliver are so different from the instant facts that the obvious clarity holding in Oliver falls short of indicating obvious clarity in this case.

The government interests at stake here are strong. Cooks and Harkleroad could not wait indefinitely for Allen to stop resisting or for his strange behavior to subside. Allen could not be safely transported until he was restrained. We cannot conclude that clearly established law prevented Cooks and Harkleroad from using

16

their Tasers in the manner used here. Other alternatives, e.g. brute physical force, also presented dangers both to Allen and the officers.

Given all of these factors, Cooks's and Harkleroad's conduct does not rise to the level of "obvious clarity," which would require all reasonable officers to inevitably conclude that the force used was unlawful. Id.; Priester, 208 F.3d at 926-27. Accordingly, Cooks and Harkleroad are entitled to qualified immunity on the excessive force claim.

## III. STATE LAW CLAIMS

Plaintiffs also argue that Cooks and Harkleroad are liable for assault and battery, and that Harkleroad is liable for negligence and wrongful death. On these state law claims, the district court found that Cooks and Harkleroad were not entitled to official immunity under Georgia law. We review de novo a district court's summary judgment denial of official immunity. See Cummings v. DeKalb Cnty., 24 F.3d 1349, 1352 (11th Cir. 1994); Griesel v. Hamlin, 963 F.2d 338, 341 (11th Cir. 1992).

### A. Assault and Battery

Under the Constitution of Georgia, Cooks and Harkleroad will have official immunity for their discretionary acts unless they acted with "actual malice." Merrow v. Hawkins, 467 S.E.2d 336, 337 (Ga. 1996). There is no dispute that their

17

actions were discretionary. "Actual malice" requires "a deliberate intention to do wrong, and does not include implied malice, i.e., the reckless disregard for the rights or safety of others. A 'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by [the suspect]." Murphy v. Bajjani, 647 S.E.2d 54, 60 (Ga. 2007) (quotations and citations omitted).

In this case, no reasonable jury could find that Cooks and Harkleroad used their Tasers with the deliberate intent to do wrong. As discussed above, the Tasers were employed during a struggle to arrest Allen, who refused to let his arms be brought together and handcuffed.

B. Negligence and Wrongful Death

Harkleroad argues that he cannot be held liable under Georgia law for any negligence-based claim resulting from the performance of discretionary acts.[9] Plaintiffs concur with Harkleroad on that position–as do we. See Campbell v. Goode, 695 S.E.2d 44, 45 (Ga. Ct. App. 2010).

IV. CONCLUSION

For the foregoing reasons the judgment of the district court is reversed, and

---

[9] A wrongful death claim is premised upon negligence, so we address it together with Plaintiffs' common law negligence claim. See Allrid v. Emory Univ., 303 S.E.2d 486, 488 (Ga. Ct. App. 1983).

the case is remanded with instructions that judgment be entered for Cooks and Harkleroad.

REVERSED and REMANDED.