[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10556
Non-Argument Calendar
_____

D.C. Docket No. 4:14-cv-00223-HLM

STAR HART,
individually and as Co-Administratrix of the
Estate of Decedent Robert Edward Hart,
JENNIFER MICIA ADKINS,
as Co-Administratix of the Estate of
Decedent Robert Edward Hart and as
Natural Guardian of A.H., a minor child and Darien Hart,

Plaintiffs - Appellees,

versus

BENJAMIN LOGAN,
individually and in his official capacity as a
Polk County, Georgia Police Officer,

Defendant - Appellant,

POLK COUNTY, GEORGIA,
a political subdivision of the State of Georgia,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(November 22, 2016)

Before WILLIAM PRYOR, JULIE CARNES and FAY, Circuit Judges.

PER CURIAM:

Officer Benjamin Logan responded to a 911 caller whose husband had tried to shoot himself.  Shortly after Officer Logan's arrival, he fatally shot the husband, allegedly in self-defense.  The wife brought claims against Officer Logan under 42 U.S.C. § 1983 and state law.  The district court denied Officer Logan's motion for summary judgment on qualified and official immunity grounds.  We hold, however, that Officer Logan is entitled to qualified immunity because the plaintiff has not demonstrated that Officer Logan violated any clearly established constitutional rights.  We also hold that Officer Logan is entitled to official immunity for the state law claims because the plaintiff has not shown that Officer Logan acted with actual malice.  Accordingly, we **REVERSE** the district court's denial of summary judgment.

2

## I.    BACKGROUND

### A.    Factual Background

Plaintiff Melissa "Star" Hart ("Plaintiff") and her husband Robert Hart fought often.  Prior to August 18, 2013, the night Mr. Hart was killed, police had responded to the Hart residence at least five times for domestic violence calls.  Defendant Benjamin Logan ("Defendant") responded to one such call, and arrested Mr. Hart at the time for allegedly choking Plaintiff and putting her in a headlock.

On the night of the shooting, the couple discussed the future of their relationship.  Mr. Hart suddenly said "I'm done; It's all over," and left the room.  He returned with a gun, which he raised to his temple.  Plaintiff grabbed Mr. Hart's arm as he pulled the trigger, causing the bullet to go upward and graze his scalp.  Plaintiff pried the gun out of Mr. Hart's hands and ran out the front door, grabbing a phone along the way to call 911, which she did outside.  Though he was "bleeding profusely," Mr. Hart followed Plaintiff outside.  He tried to take the gun away from Plaintiff while she was on the phone with the emergency dispatcher.  Mr. Hart was unsuccessful and retreated to the front porch, where he began smoking and continued to yell, "Shoot me again!"  Plaintiff and Mr. Hart remained in the front yard and on the front porch, respectively, until the police arrived.

Defendant and Brandon Williams, county law enforcement officers, responded to Plaintiff's 911 call.  Defendant knew from his prior response to the

3

residence that Mr. Hart was mentally unstable and violent, with a history of refusing to cooperate with police officers. En route to Plaintiff's residence, the officers learned Plaintiff had possession of the handgun that Mr. Hart had used to shoot himself.

The officers arrived at the house around 10:00 p.m. It was dark and the sky was overcast, but the parties dispute the visibility at the time. Defendant asserts that visibility was very low, as the only light source available was the front porch light. Plaintiff contends, however, that the police cruiser headlights remained on and provided additional illumination, such that visibility was good enough to see what happened.

Plaintiff met the officers at the street and gave the handgun to Defendant, who secured it in his vehicle. The parties dispute what was said after Defendant asked Plaintiff if there were any more weapons. Plaintiff claims she told Defendant there were no more weapons. Defendant recalls that Plaintiff said she was unsure, that she did not know how Mr. Hart had obtained the gun, which he was not supposed to have, and that she did not know if he had any others. The recorded 911 call indicates that Plaintiff only said "help him" when the officers arrived. Plaintiff contends, however, that the recording did not pick up the entirety of their conversation because she tossed her phone away when the police arrived.

4

Officer Williams approached Mr. Hart while Defendant held his firearm in a "low ready" position in case Mr. Hart attacked Williams. Mr. Hart—dressed in a t-shirt, shorts, and a baseball cap—was still smoking near the porch when Officer Williams approached him. Defendant recalls that Mr. Hart's shorts were baggy, though Plaintiff contends the shorts were too tight to contain a weapon.

Officer Williams asked Mr. Hart to sit down, but Mr. Hart refused, yelling, "Shoot me in the head again! Shoot me in the f***ing head!" Defendant contends that Mr. Hart then moved toward Plaintiff with the intent to attack her. Plaintiff denies that Mr. Hart was attempting to attack her. Officer Williams grabbed Mr. Hart by the shirt, but Mr. Hart broke free as he ducked out of his shirt and spun around toward Defendant.

Mr. Hart began moving towards Defendant, repeatedly yelling, "Give me that f***ing gun!" The parties dispute the manner in which Mr. Hart approached defendant. Defendant claims that Mr. Hart was running towards him, while Plaintiff contends that Mr. Hart was moving slowly and stumbling. As Mr. Hart approached Defendant, Defendant began to back up and commanded Mr. Hart to stop and show his hands. Mr. Hart refused to follow these commands, instead repeatedly and profanely demanding that Defendant shoot him.

Defendant claims that when Mr. Hart had come within five to eight feet of Defendant, Mr. Hart began moving his hand down toward his waist as though he

5

were moving toward his pocket.  Defendant said he was afraid that Mr. Hart was attempting to reach a concealed weapon to harm him with, plus Hart was also close enough to try to take Defendant's own weapon.  Plaintiff contends that Mr. Hart never threatened Defendant nor attempted to strike him or take his gun.  Plaintiff asserts that Mr. Hart did not move his hands toward his pockets, and that Mr. Hart's shorts were too tight to hold any weapon in the pockets.  Plaintiff also claims that Mr. Hart was about twenty-five feet away from Defendant, too far away to create a threat.  Explaining that he was acting in self-defense, Defendant fired two shots, about one second apart, which both struck Mr. Hart in the chest.  Medical personal arrived shortly thereafter and treated Mr. Hart, who died later that night.

### B.    Procedural History

Plaintiff asserted an excessive force claim against Defendant in his individual capacity under 42 U.S.C. § 1983.  Jennifer Micia Adkins joined Plaintiff in alleging some damages in her capacity as co-administratrix of Mr. Hart's estate.  Plaintiff also asserted claims under state law for wrongful death, assault and battery, punitive damages, and attorney's fees.

Defendant moved for summary judgment on qualified immunity grounds for the § 1983 claims and on official immunity grounds for the state law claims.  The district court denied Defendant's motion, finding a genuine dispute as to whether

the shooting was justified and whether it was in self-defense.  Defendant timely appealed.[1]

## C.    Standard of Review

We review *de novo* a district court's disposition of a summary judgment motion based on qualified immunity and apply the same legal standards as the district court.  *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003).  Any factual disputes are resolved in the plaintiff's favor, and we then decide whether that version of the facts entitles the defendant to qualified immunity.  *Id.*; *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant . . . .").  Consequently, the "'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'"  *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002), and *Priester v. City of Riviera Beach*, 208 F.3d 919, 925, n.3 (11th Cir. 2000)).  Nevertheless, we view the facts from the plaintiff's perspective because the determinative issue on appeal is "not which facts the parties might be able to prove," but whether "certain given facts" demonstrate a

---

[1]  In his brief, Defendant also raises again his objection to the district court's acceptance of Plaintiff's post-deposition sworn statement in which Plaintiff asserts several facts in her favor. Defendant alleges this statement to be invalid under the sham affidavit rule.  We will assume no abuse of discretion by the district court in considering Plaintiff's statement. *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1259 (11th Cir. 2004) ("We review evidentiary rulings made by the district court for abuse of discretion.").

violation of clearly established law. *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009). We likewise review *de novo* the district court's decision regarding official immunity for Plaintiff's state law claims. *Hoyt v. Cooks*, 672 F.3d 972, 981 (11th Cir. 2012).

## II.    DISCUSSION

### A.    Qualified Immunity

In order for Plaintiff's case to survive summary judgment, she must show, on her version of the facts, that Defendant is not entitled to qualified immunity. Qualified immunity completely "protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). To obtain qualified immunity, a public official must first show that he was engaged in a discretionary duty when the allegedly wrongful act occurred. *Id.* at 995. The parties do not dispute that Defendant was acting within his discretionary duty as a law enforcement officer when the shooting occurred.[2] The burden thus shifts to Plaintiff to show that qualified immunity is not appropriate. *Id.*

---

[2] Though Plaintiff sets out the argument that Defendant violated a ministerial duty, this argument is offered only to rebut Defendant's claim of state-based official immunity. Plaintiff

8

Plaintiff must satisfy a two-part test to meet her burden.  *McCullough*, 559 F.3d at 1205.  She must show that Defendant's conduct violated a constitutional right.  *Id.*  Assuming a violation occurred, Plaintiff must also show that the right was clearly established at the time of the incident.  *Id.*  To be clearly established, the contours of a right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff*, 134 S. Ct. at 2023.  "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendant[] that [his] alleged conduct was unconstitutional."  *Tolan*, 134 S. Ct. at 1866 (internal quotation marks omitted).  Fair warning is most commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose.  *See Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012).  While a "judicial precedent with materially identical facts is not essential for the law to be clearly established," *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010), "[t]his inquiry must be undertaken in light of the specific context of the case" to determine "[t]he dispositive question [of] whether the violative nature of particular conduct is clearly established."  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

does not dispute, for qualified immunity purposes on the federal claims, that Defendant was acting within the scope of his discretionary duties.

9

In this case, Plaintiff cannot overcome Defendant's qualified immunity defense. Even assuming a constitutional violation on the first prong of the analysis, Plaintiff cannot show that the contours of the right were so clearly established in this context that it would "inevitably lead every reasonable officer in [Defendant's] position to conclude the force was unlawful." *Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013). Because we may consider the prongs of the qualified immunity test in either order, we proceed directly to examining the qualified immunity test's second prong. *See Maddox v. Stephens*, 727 F.3d 1109, 1120–21 (11th Cir. 2013). Plaintiff cites to several cases from this Circuit that she contends clearly establish that Defendant's actions were unconstitutional. In each case, this Court held the use of deadly force in question was unreasonable. However, we conclude that each case is factually distinguishable because Defendant in this case faced a more dangerous situation than the officers in the cited cases. This is so even after construing the factual disputes in favor of Plaintiff, as required at the summary judgment stage

Plaintiff points first to *Gilmere v. City of Atlanta*. 774 F.2d 1495 (11th Cir. 1985) (en banc). In *Gilmere*, police officers shot and killed a man after he was arrested for drunk driving and threatening another motorist. *Id.* at 1496–97, 1502. We noted that, under the circumstances, the officers did not face a dangerous situation because of the man's "small size, intoxicated state, and lack of a

10

weapon," and because they were in "an outdoor parking lot in the late afternoon, at a sufficient distance from bystanders to establish that the surroundings posed no particular threat to the safety of the officers." *Id.* at 1502.  These considerations that weigh against deadly force in *Gilmere* generally cut the other way in this case. Defendant here encountered a sizeable man[3] who was clearly mentally disturbed and who had already tried to shoot himself.  Ignoring Defendant's commands to stop, and advancing toward Defendant, Mr. Hart demanded Defendant's gun.  The confrontation happened at night and with bystanders in the area.

Plaintiff next cites *McKinney v. DeKalb County*.  997 F.2d 1440 (11th Cir. 1993).  In *McKinney*, police officers responded to a woman's 911 call for help in dealing with her sixteen-year-old son, who had locked himself in his bedroom with a knife.  *Id.* at 1442.  Officers arrived to find the boy sitting on the floor of his closet, holding "a butcher knife in one hand and a twelve-inch stick in the other." *Id.*  One of the officers knelt by the boy and talked to him for ten minutes without a response before the boy threw the stick toward the other officer and began to stand up.  *Id.*  The other officer then fired five shots, hitting the boy three times.  *Id.* Clearly, those facts differ from the scenario encountered by Defendant here.

---

[3]  According to his deposition testimony, Defendant believed Mr. Hart to be about 5'10" to 6' tall and weigh about 235 lbs.  Defendant claimed to be 6' tall and weigh 260 lbs. the night of the shooting, and estimated that Officer Williams was about 5'11" and 210 lbs.

Officers faced a more similar situation in *Mercado v. City of Orlando*, which Plaintiff contends gave fair warning to Defendant.  407 F.3d 1152 (11th Cir. 2005). In *Mercado*, a man and his wife had an argument about the end of their marriage, and the man began to threaten suicide.  *Id.* at 1154.  The man "used a kitchen knife to make multiple cuts on his arms," and eventually "grasped the knife with both hands and pointed it towards his heart."  *Id.*  The police arrived and tried to talk with the man through the apartment door for twenty minutes, and then proceeded to enter the apartment with the wife's permission.  *Id.*  They twice ordered the man—who was now seated on the kitchen floor, crying—to drop his knife, but did not warn him that they would use force if he did not comply.  *Id.*  Although the man did not comply, he did <u>not</u> make any threatening moves towards the officers. *Id.*  Less than a minute later, the officers fired a Sage Launcher, which expelled a fast-moving baton, directly at the man's head from six feet away, causing debilitating brain injuries.  *Id.* at 1154–55.  The weapon's use in this manner was considered to be deadly force.  *Id.* at 1155, 1158.

Unlike in *McKinney* or *Mercado*, Defendant did not have a ten to twenty minute period of time to talk with Mr. Hart and calmly assess how dangerous he was.  Instead Defendant faced a tense and rapidly-escalating situation at the time of the shooting, with Mr. Hart standing and then advancing towards Defendant, all the while ignoring Defendant's repeated commands to stop and show his hands.  Mr.

12

Hart's conduct rendered him a much more potentially dangerous threat to Defendant than were the seated and stationary victims in *McKinney* and *Mercado*. In addition, given Mr. Hart's repeated demands that Defendant give him the gun, coupled with his approach toward Defendant, a concern by Defendant that Mr. Hart was trying to arm himself, by either getting his own gun back or taking Defendant's gun, was not an unreasonable fear. Mr. Hart's efforts to arm himself with a gun, if successful, would have created a much more dangerous situation than were he only holding a knife, like the individuals in *McKinney* and *Mercado*. Indeed, Mr. Hart had already behaved much more dangerously than either individual in *McKinney* or *Mercado* by trying to shoot himself—as opposed to making non-fatal cuts on his arms or locking himself in a room—illustrating the greater danger in the situation faced by Defendant. Furthermore, Defendant knew from his previous experience with Mr. Hart that Mr. Hart had a history of violent disputes with Plaintiff—including an arrest for allegedly choking her—which reasonably informed Defendant's perception of Mr. Hart's capacity for erratic and unpredictable behavior posing a great danger to others.

Analyzing excessive force under the Fourth Amendment is a fact-intensive inquiry, so these distinctions are important because "an objectively reasonable police officer could believe [they] might make a difference" in determining whether a use of deadly force was reasonable. *Long v. Slaton*, 508 F.3d 576, 580,

13

584 (11th Cir. 2007) (internal quotation marks omitted).  Because of the above factual distinctions, none of the cases Plaintiff cites provided to Defendant fair notice that his conduct violated Mr. Hart's constitutional rights under the circumstances.

Plaintiff also tries to distinguish this case from cases in which the use of deadly force was held to be reasonable, but we find these distinctions unpersuasive.  A notable example cited in Plaintiff's brief is this Court's decision in *Long v. Slaton*, *supra*.  In *Long*, a police officer responded to a father's request for help in dealing with his son's "psychotic episode."  508 F.3d at 578.  The son resisted the officer's attempts to take him into custody, fleeing to the officer's unattended police cruiser, which still had the keys in the ignition.  *Id.* at 579.  The officer drew his firearm and told the son he would be shot if he did not get out of the vehicle.  When the son did not comply, but instead began backing the cruiser out of the driveway into the road, the officer fired three shots, killing the son.  *Id.* We found the officer's use of deadly force was reasonable under the circumstances given the potential danger posed if the son had fled in the police cruiser.  *Id.* at 581.  We also considered the son's "unstable frame of mind, energetic evasion of the deputy's physical control, [the] criminal act of stealing a police cruiser," and his starting to drive it away despite warnings to stop.  *Id.* at 581–82.

14

Like the son in *Long*, Mr. Hart was in an "unstable frame of mind" and vigorously evaded Officer Williams' physical control.  He also ignored orders to stop advancing towards Defendant and to show his hands, even though Defendant was pointing a gun at him.  Though the son in *Long* had actually gained control of the police car, Mr. Hart was advancing toward Defendant and demanding his gun.  Had Mr. Hart obtained possession of the Defendant's gun, as his words and conduct suggested was his intention, the resulting situation would have posed much greater danger to both officers and bystanders than did that in *Long*.  It follows then that Plaintiff cannot persuasively argue that *Long*, in which we found qualified immunity to apply, served as fair notice to Defendant of the illegality of his conduct.

In sum, Plaintiff has failed to demonstrate that under the above circumstances, Defendant had fair notice that the use of deadly force would be deemed unconstitutional.

### B.    State Official Immunity

Defendant asserts the defense of official immunity in response to Plaintiff's state law claims.  Georgia law grants state officials "official immunity for their discretionary actions unless they acted with 'actual malice' or an 'actual intent to cause injury.'"  *Black v. Wigington*, 811 F.3d 1259, 1265 (11th Cir. 2016) (citing GA. CONST. art. I, § 2, ¶ IX(d)).  While actual malice can be inferred from an

officer's conduct, merely unreasonable or "[e]ven recklessly illegal conduct does not support an inference of actual malice." *Id.* at 1266.  A showing of actual malice is "a demanding standard" that requires "an officer to act with 'a deliberate intention to do a wrongful act.'" *Id.* (quoting *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999)).

Under Georgia law, a law enforcement official's decision to use force while on duty falls squarely within his discretionary authority.  *See Cameron v. Lang*, 549 S.E.2d 341, 346 (Ga. 2001) (finding that police officers exercised discretion when engaging in pursuit even though they failed to turn on lights or sirens while running a stop sign); *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999) (noting "acts in executing the warrant and firing the guns [at decedent] were discretionary"); *Weaver v. City of Statesboro*, 653 S.E.2d 765, 771 (Ga. Ct. App. 2007) ("Responding to emergency situations or calls . . . has been consistently held to involve the exercise of personal deliberation and judgment by the officer and therefore not to involve mere ministerial functions."); *Tittle v. Corso*, 569 S.E.2d 873, 876 (Ga. Ct. App. 2002) (Officer "was acting within the scope of his authority and performing an official discretionary function in investigating a 'shots fired' call.").  Georgia law allows law enforcement officers to use deadly force in self-

16

defense,[4] O.C.G.A. § 16-3-21(a), or to effect the arrest a suspected felon under certain circumstances, including "when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others."[5] O.C.G.A. § 17-4-20(b). Accordingly, "an officer who, in the performance of his official duties, shoots another in self-defense is shielded from tort liability by the doctrine of official immunity." *Kidd*, 518 S.E.2d at 125.

Defendant claims that he shot Mr. Hart in both self-defense and based on fear for the safety of others. Even if Defendant was wrong in his assessment that deadly force was justified in this situation, this does not, by itself, show that Defendant acted with actual malice. *See Daley v. Clark*, 638 S.E.2d 376, 386 (Ga. Ct. App. 2006) ("[A]ctual malice does not include conduct exhibiting a reckless

---

[4]

> [A] person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

O.C.G.A. § 16-3-21(a)

[5]

> Sheriffs and peace officers . . . may use deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm.

O.C.G.A. § 17-4-20(b)

disregard for human life." (internal quotation marks omitted)).  Indeed, this Court

has noted that Georgia's actual malice standard is higher than what is required to

make out a Fourth Amendment violation.  In *Bashir v. Rockdale County*, this Court

found that

> [a]lthough . . . the record support[ed] the conclusion the deputies acted
> unreasonably and violated [the plaintiff's] Fourth Amendment rights,
> [the plaintiff had] not sustained his burden of demonstrating the
> existence of a genuine issue of fact that the deputies possessed "a
> deliberate intention to do wrong" sufficient to satisfy the actual malice
> standard.

445 F.3d 1323, 1333 (11th Cir. 2006).  Like the plaintiff in *Bashir*, Plaintiff has put

forth no evidence that Defendant shot Mr. Hart with "deliberate intention to do a

wrongful act."  *Wigington*, 811 F.3d at 1266.  Consequently, Plaintiff fails to

demonstrate that Defendant acted with actual malice sufficient to overcome

Defendant's official immunity.

Plaintiff makes an additional argument against granting official immunity to

Defendant by claiming that Defendant violated his ministerial duties in failing to

follow the standard operation procedures of the Sheriff's Department, making him

ineligible for official immunity.  Georgia's constitution waives immunity for state

employees who cause damages by "the negligent performance of, or negligent

failure to perform, their ministerial functions."  GA. CONST. art. I, § 2, ¶ IX(d).

Even if Defendant had failed to follow proper procedures—a claim that Defendant

denies—Plaintiff's argument fails because, as discussed above, an officer's actions

18

in response to an emergency are discretionary acts, not ministerial.  Because Plaintiff can show no actual malice on the part of Defendant, and because Defendant was not engaged in any ministerial functions, Plaintiff cannot overcome Defendant's assertion of official immunity as a defense to Plaintiff's state law claims.

## III.    CONCLUSION

State officials sued for federal constitutional violations are entitled to qualified immunity for their discretionary actions, unless their actions violate rights clearly established in the law.  Similarly, state officials in Georgia are entitled to official immunity under state law for their discretionary actions that cause injury, unless they act with actual malice.  Plaintiff has not demonstrated that either exception applies to Defendant's actions in this case, so Defendant is entitled to qualified immunity for the § 1983 claims and official immunity for the state law claims.  The district court's order denying summary judgment to Defendant on these grounds is therefore **REVERSED** and the case is remanded to the district court for proceedings consistent with this opinion.